## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| DR. JAMES DOBSON FAMILY INSTITUTE and USATRANSFORM d/b/a UNITED IN PURPOSE,<br><br>   Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; CHARLOTTE BURROWS, Chair of the United States Equal Employment Opportunity Commission; and UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION<br><br>   Defendants. | Case No. _____ |

---

### PLAINTIFFS' VERIFIED COMPLAINT
### FOR DECLARATORY AND INJUNCTIVE RELIEF

#### October 15, 2024

---

**FIRST & FOURTEENTH PLLC**

L. Martin Nussbaum*
Andrew Nussbaum
2 N. Cascade Ave., Suite 1430
Colorado Springs, CO 80903
(719) 428-2386
martin@first-fourteenth.com
andrew@first-fourteenth.com

  * *pro hac vice* application forthcoming

**S|L LAW PLLC**

John C. Sullivan
Jace R. Yarbrough
610 Uptown Blvd., Suite 2000
Cedar Hill, TX 75104
(469) 523-1351
john.sullivan@the-sl-lawfirm.com
jace.yarbrough@the-sl-lawfirm.com

**Table of Contents**

I.      INTRODUCTION AND SUMMARY OF THE ACTION ........................................... 1

II.     JURISDICTION AND VENUE .................................................................................. 3

III.    FOUR IMMORAL FEDERAL MANDATES ........................................................... 3

   A.   HHS'S 2024 RULE MANDATING COVERAGE OF ABORTION, IVF, AND
        GENDER TRANSITION SERVICES .............................................................. 3

      1.   Statutory framework ........................................................................................ 3

      2.   Previous interpretations of Section 1557 and related litigation ..................... 5

      3.   The 2021 and 2022 notices .............................................................................. 8

      4.   2024 Rule ........................................................................................................ 9

      5.   Covered employers, insurers, TPAs, PBMs, and other service providers are
           required to offer employee benefits covering abortion, gender transition services,
           and immoral infertility treatments ................................................................ 17

      6.   Other requirements of the 2024 Rule ............................................................ 18

   B.   EEOC'S INTERPRETATION OF TITLE VII MANDATING COVERAGE OF
        GENDER TRANSITION SERVICES ............................................................ 18

   C.   EEOC'S PREGNANT WORKERS FAIRNESS ACT RULE MANDATING
        ACCOMMODATION OF ABORTION AND IVF ......................................... 22

      1.   PWFA Statute ............................................................................................... 22

      2.   PWFA Proposed Rule ................................................................................... 26

      3.   PWFA Rule ................................................................................................... 28

   D.   EEOC'S GUIDANCE REGARDING HARASSMENT MANDATING ACCESS
        TO BATHROOMS AND OTHER SINGLE-SEX SPACES AND IMPOSING
        GENDER IDEOLOGICAL SPEECH ............................................................ 30

   E.   ENFORCEMENT MECHANISMS FOR THE IMMORAL FEDERAL
        MANDATES .................................................................................................... 34

IV.    PARTIES ................................................................................................................. 37

   A.   PLAINTIFFS ................................................................................................... 37

      1.   Dr. James Dobson Family Institute .............................................................. 37

      2.   USATransForm d/b/a United in Purpose ...................................................... 41

      3.   UIP has associational standing to sue on behalf of its employer members ... 44

   B.   DEFENDANTS ................................................................................................ 47

V.      THE IMMORAL FEDERAL MANDATES BURDEN PLAINTIFFS' RELIGIOUS
        EXERCISE...................................................................................................48

VI.     CAUSES OF ACTION....................................................................................50

        Claim 1: Religious Freedom Restoration Act.................................................50

        Claim 2: First Amendment Free Exercise and ACA Section 1557..........................51

        Claim 3: First Amendment Free Exercise and Title VII.......................................52

        Claim 4: First Amendment Free Exercise and PWFA Rule..................................52

        Claim 5: First Amendment Expressive Association and Title VII...........................53

        Claim 6: First Amendment Speech. .............................................................53

        Claim 7: Administrative Procedure Act.........................................................54

VII.    PRAYER FOR RELIEF ..................................................................................55

Plaintiffs, the Dr. James Dobson Family Institute ("JDFI") and USATransForm d/b/a United in Purpose for itself and its employer members ("UIP" and together with JDFI, "Plaintiffs") through their attorneys, First & Fourteenth PLLC and S|L Law PLLC, allege:

## I.    INTRODUCTION AND SUMMARY OF THE ACTION

1.    This lawsuit challenges four recent regulatory actions of the Department of Health and Human Services (HHS) and the Equal Employment Opportunity Commission (EEOC) that substantially burden the religious exercise of Plaintiffs. First, Plaintiffs challenge a recent rule issued by the Department of Health and Human Services ("HHS") purportedly interpreting Section 1557 of the Affordable Care Act to require covered entities, their insurers, and third-party administrators to cover abortion and gender-transition services in employee health plans. Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37,522 (May 6, 2024) ("2024 Rule"). Second, Plaintiffs challenge the Equal Employment Opportunity Commission's ("EEOC") related interpretation of Title VII to require covered employers to cover gender-transition services in their health plans. EEOC, Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity, questions 4-5 (June 15, 2021).[1] Plaintiffs refer collectively to HHS's and EEOC's respective interpretations of Section 1557 and Title VII to require coverage of abortion and gender-transition services as the "AGT Mandate."[2]

---

[1]    Available at https://www.eeoc.gov/laws/guidance/protections-against-employment-discrimination-based-sexual-orientation-or-gender.

[2] HHS often refers to gender transition services as "gender-affirming care." *See, e.g.*, 2024 Rule, 89 Fed. Reg. at 37,579. This complaint uses the terms interchangeably. They include puberty blockers, cross-sex hormones, other pharmaceuticals, "top" and "bottom" surgeries, gender-conforming cosmetic surgeries, voice reconstruction, "affirming" care, related counseling, and other treatments in furtherance of a gender transition.

2.      Third, Plaintiffs challenge EEOC's recent rule purportedly interpreting the Pregnant Workers Fairness Act (PWFA) to require covered employers to accommodate employee abortions and immoral infertility treatments. Implementation of the Pregnant Workers Fairness Act, 89 Fed. Reg.  29,096 (April 29, 2024) ("PWFA Rule"). Fourth, Plaintiffs challenge recent Harassment Guidance that requires covered employers to use false pronouns inconsistent with an individual's biological sex and grant access to single-sex spaces by members of the opposite sex. *See* EEOC Enforcement Guidance on Harassment in the Workplace (April 29, 2024), https://www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-workplace ("Harassment Guidance").

3.      The AGT Mandate, the PWFA Rule, and the Harassment Guidance, along with prior versions of the same rules, have been previously enjoined in this District and by other courts as a plain violation of the right to religious free exercise.[3] For the same reasons, Plaintiffs respectfully request declaratory and injunctive relief that Section 1557, Title VII, and any regulations or guidances implementing or interpreting those statutes do not require Plaintiffs to violate their sincerely held religious beliefs.

---

[3]      *Cath. Benefits Ass'n v. Burrows*, 2024 WL 4315021, at *10 (D.N.D. Sept. 23, 2024) (enjoining PWFA Final Rule's abortion-and-IVF-accommodation mandate, as well Harassment Guidance as applied to the Catholic Benefits Association and its members); *Louisiana v. Equal Emp. Opportunity Comm'n*, 705 F. Supp. 3d 643 (W.D. La. 2024) (enjoining PWFA Final Rule's abortion-accommodation mandate as applied to United States Conference of Catholic Bishops and two Catholic dioceses); *Christian Emps. All. v. United States Equal Opportunity Comm'n*, 2024 WL 935591 (D.N.D. Mar. 4, 2024) (enjoining HHS's and EEOC's 2016 gender transition services Mandate as applied to Christian Employers Alliance and its members); *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113 (D.N.D. 2021) (enjoining AGT Mandate as applied to religious employers), *aff'd in relevant part*, *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583 (8th Cir. 2022); *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 941 (N.D. Tex. 2019) (enjoining HHS's 2016 gender transition services mandate as applied to Plaintiffs).

## II.    JURISDICTION AND VENUE

4.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361 because this action arises under the Constitution and laws of the United States. The Court has jurisdiction to render declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 2000bb-1.

5.    Venue lies in this district under 28 U.S.C. § 1391(e)(1). Plaintiff UIP resides in this District and this Division because its principal place of business is in Southlake, Texas.

## III.    FOUR IMMORAL FEDERAL MANDATES

### A.    HHS'S 2024 RULE MANDATING COVERAGE OF ABORTION, IVF, AND GENDER TRANSITION SERVICES

#### 1.    Statutory framework

6.    Together, the Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119 (Mar. 23, 2010), and the Health Care and Education Reconciliation Act of 2010, Pub. L. 111-152, 124 Stat. 1029 (Mar. 30, 2010), make up and are known as the Affordable Care Act ("ACA").

7.    Section 1557(a) of the ACA prohibits discrimination in federally funded healthcare programs and activities on the basis of (1) race, color, and national origin, (2) sex, (3) age, and (4) disability. *See* 42 U.S.C. § 18116(a). The statute does not do this directly. Instead, it incorporates by reference and bars discrimination "on the ground prohibited" by four other federal laws: (1) Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.); (2) Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.); (3) the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.); and (4) Rehabilitation Act, section 794 of Title 29. Of these four federal laws, Title IX alone prohibits discrimination on the basis of sex.

8.    Section 1554 of the ACA provides that "notwithstanding any other provision of [the ACA, HHS] shall not promulgate any regulation that . . . violates the principles of informed consent and the ethical standards of health care professionals." 42 U.S.C. § 18114(5).

9.    Section 1557(b) of the ACA provides that nothing in the statute "shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available to individuals aggrieved under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), section 794 of Title 29, or the Age Discrimination Act of 1975." 42 U.S.C. § 18116(b).

10.    Title IX states that no person "shall, on the basis of sex, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

11.    Title IX's prohibition, however, "shall not apply" to an institution "controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3).

12.    Nor does Title IX's prohibition on sex discrimination require a "public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 20 U.S.C. § 1688.

13.    The Rehabilitation Act prohibits certain forms of disability discrimination.

14.    The Rehabilitation Act's prohibition, however, specifically excludes "transsexualism" and "gender identity disorder" that do "not result[] from physical impairments." 42 U.S.C. § 18116(a) (pointing to section 794 of title 29 as providing substantive

4

content of protection). 29 U.S.C. § 705(20)(F)(i) provides that "transsexualism" and "gender identity disorders not resulting from physical impairments" are not a "disability" under section 794. Those terms at the time were synonymous with having a transgender identity, so transgender persons that do not have a disorder of sex development—*i.e.,* a physical impairment—do not have a "disability" and, thus, are excluded from "section 792 of title 29." 42 U.S.C. § 18116(a). The specific exclusion of transgender identity governs the general prohibitions of Section 1557, so the general term "based on sex" cannot be read to include discriminating based on transgender identity in Section 1557.

### 2.    Previous interpretations of Section 1557 and related litigation

15.    The regulatory background to this dispute begins with the 2016 Rule that HHS issued interpreting Section 1557. On May 18, 2016, HHS finalized a rule pursuant to Section 1557 stating that impermissible discrimination "on the basis of sex" "includes . . . discrimination on the basis of . . . **termination of pregnancy**, . . . sex stereotyping, and gender identity." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376, 31,467 (emphasis added) ("2016 Rule").

16.    On December 31, 2016, the U.S. District Court for the Northern District of Texas issued a nationwide preliminary injunction prohibiting HHS from "enforcing the [2016] Rule's prohibition against discrimination on the basis of gender identity or termination of pregnancy." *Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660, 696 (N.D. Tex. 2016).

17.    In May 2019, HHS issued a Notice of Proposed Rulemaking, and in June 2019 it published a proposed rule, to amend the 2016 Rule. *See* Nondiscrimination in Health and Health Education Programs or Activities, 84 Fed. Reg. 27,846 (June 14, 2019). Citing the *Franciscan Alliance* court's preliminary-injunction decision, the proposed rule stated that the 2016 Rule's definition of "sex" "exceeded [HHS's] authority under Section 1557." *Id.* at 27,849. The

proposed rule sought to address this issue by repealing the 2016 Rule's definition of "sex" in its entirety, which would, according to HHS, "allow the Federal courts, in particular, the U.S. Supreme Court . . . to resolve any dispute about the proper legal interpretation of" the term "sex" in Section 1557. *Id.* at 27,873. As the proposed rule noted, *see id.* at 27,855, the Supreme Court had recently granted certiorari to decide whether sex discrimination under Title VII included discrimination on the basis of sexual orientation and gender identity, in three cases that would later be decided together as *Bostock v. Clayton County*, 590 U.S. 644 (2020).

18.    On June 12, 2020, HHS finalized its new rule, the "2020 Rule." *See* Nondiscrimination in Health and Health Education Programs or Activities, 85 Fed. Reg. 37,160 (June 19, 2020).

19.    The 2020 Rule would have taken effect on August 18, 2020. *Id.* at 37,160.

20.    The 2020 Rule sought to repeal certain portions of the 2016 Rule, and in particular, "omit[] the vacated language concerning gender identity and **termination of pregnancy**." *Id.* at 37,162 (emphasis added); *see also id.* at 32,236 ("[T]his final rule removes . . . the expansive inclusion of gender identity and sex stereotyping in the definition of sex discrimination."). But HHS declined to replace the 2016 Rule's definition of "sex" with a new definition, reasoning instead that the Supreme Court's then-forthcoming decision in Bostock would "likely have ramifications for the definition of 'on the basis of sex' under Title IX." *Id.* at 37,168. Thus, simply repealing the prior definition would permit "application of the [Bostock] Court's construction." *Id.*

21.    Responding to the *Franciscan Alliance* court's vacatur order, HHS said that, under the 2020 Rule, it would "interpret Section 1557's prohibition on sex-based discrimination

consistent with Title IX and its implementing regulations," *id.* at 37,192, and that it was amending

its Title IX regulations "to explicitly incorporate relevant statutory exemptions from Title IX,

including abortion neutrality and the religious exemption," *id.* at 37,162.

22.    On June 15, 2020, the Supreme Court decided *Bostock*. The Court held that when "an

employer . . . fires someone simply for being homosexual or transgender," the employer has

"discriminated against that individual 'because of such individual's sex'" within the meaning of

Title VII. 590 U.S. at 681.

23.    Before the 2020 Rule could take effect, on August 17, 2020, the U.S. District Court

for the Eastern District of New York entered "a stay and preliminary injunction to preclude the

[2020 Rule] from becoming operative." *Walker v. Azar*, 2020 WL 4749859, at *1 (E.D.N.Y. 2020).

The court concluded that the 2020 Rule is "contrary to *Bostock,*" that HHS's attempt to repeal

the 2016 Rule was "contrary to law," and that the plaintiffs were likely to succeed on the merits of

their APA claim. *Id.* at *1, *9. On September 2, 2020, the U.S. District Court for the District of

Columbia entered a nationwide preliminary injunction against aspects of the 2020 Rule. *See*

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, 2020 WL 5232076, at *45

(D.D.C. 2020).

24.    The effect of these two overlapping injunctions is that the 2016 Rule remained in

place and that the 2020 rule never took effect. *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d

1113, 1138 (D.N.D. 2021).

25.    Two courts applying the Religious Freedom Restoration Act subsequently enjoined

the 2016 Rule. *Religious* Sisters *of Mercy v. Becerra*, 55 F.4th 583, 609 (8th Cir. 2022) (affirming

injunction of District of North Dakota); *Christian Emps. All. v. United States Equal Opportunity Comm'n*, 2024 WL 935591 (D.N.D. Mar. 4, 2024).

### 3.    The 2021 and 2022 notices

26.    The day he was sworn into office, President Biden issued an executive order asserting that "laws that prohibit sex discrimination . . . prohibit discrimination on the basis of gender identity or sexual orientation." Exec. Order No. 13,988, 86 Fed. Reg. 7023, 7023 (Jan. 20, 2021).

27.    On May 25, 2021, pursuant to this executive order, HHS published a document titled "Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972." 86 Fed. Reg. 27,984 (May 25, 2021) ("Notification"). The May 2021 notice announced that "consistent with the Supreme Court's decision in *Bostock* and Title IX," HHS would "interpret and enforce section 1557 of the Affordable Care Act prohibition on discrimination on the basis of sex to include: Discrimination on the basis of sexual orientation; and discrimination on the basis of gender identity." *Id.* at 27,984.

28.    Shortly thereafter a group of physicians challenged the notification on the grounds that it would force them to treat youth suffering from gender dysphoria in a manner that violated their clinical judgment and conscience. *Neese v. Becerra*, 640 F. Supp. 3d 668, 668–70 (N.D. Tex. 2022). The U.S. District Court for the Northern District of Texas found the Notification to be "not in accordance with the law." *Id.* at 3. The Court entered a declaratory judgment declaring that "Section 1557 of the ACA does not prohibit discrimination on account of sexual orientation and gender identity, and the interpretation of 'sex' discrimination that the Supreme Court of the United States adopted in [*Bostock*] is inapplicable to the prohibitions on 'sex' discrimination in Title IX of the Education Amendments of 1972 and in Section 1557 of the ACA." Final Judgment, *Neese*, 2:21-cv-163-Z (N.D. Tex. Nov. 22, 2022), ECF No. 71.

### 4.    2024 Rule

29.    On August 4, 2022, HHS published its notice of proposed rulemaking interpreting Section 1557.  Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47,824 ("2022 NPRM").  On May 6, 2024, HHS published a final rule interpreting Section 1557, Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37,522 (May 6, 2024).  Plaintiffs refer this rule as the "2024 Rule."

30.    The 2024 Rule applies to a "health program or activity operated by a covered entity." 89 Fed. Reg. at 37,699, to be codified at 45 C.F.R. § 92.101(a)(1). The 2024 Rule defines "covered entity" as, inter *alia*, a "recipient of Federal financial assistance." 89 Fed. Reg. at 37,694, to be codified at 45 C.F.R. § 92.4. The 2024 Rule defines "health program or activity" to cover virtually all healthcare providers and facilities, as well as health insurers, third-party administrators, pharmacy benefits managers, and other health service providers in the United States: "Health program or activity" means: "(1) Any project, enterprise, venture, or undertaking to: (i) Provide or administer health-related services, health insurance coverage, or other health-related coverage; (ii) Provide assistance to persons in obtaining health-related services, health insurance coverage, or other health-related coverage; (iii) Provide clinical, pharmaceutical, or medical care; (iv) Engage in health or clinical research; or (v) Provide health education for health care professionals or others." 89 Fed. Reg. at 37,694, to be codified at 45 C.F.R. § 92.4; *see also* 89 Fed. Reg. at 37,538 (noting that HHS's Office of Civil Rights ["OCR"] "agrees with commenters' assessment that the Proposed Rule's approach to the inclusion of health insurance coverage and other health-related coverage in the definition of 'health program or activity' is most consistent with section 1557's statutory text and Congressional intent."); *id.* (stating that the 2024 Rule applies to all the operations of a health program or activity if any part receives federal financial assistance).

31.    The 2024 Rule provides: "Discrimination on the basis of sex includes, but is not limited to, discrimination on the basis of: (i) Sex characteristics, including intersex traits; (ii) Pregnancy or related conditions; (iii) Sexual orientation; (iv) Gender identity; and (v) Sex stereotypes." 89 Fed. Reg. at 37,699, to be codified at 45 C.F.R. § 92.101(a)(2). The 2024 Rule does not provide definitions of these terms.

32.    In its 2022 NPRM, HHS defined "gender identity" in the 2022 Notice of Proposed Rulemaking to include "transgender," "nonbinary," "gender nonconforming," "genderqueer," or "genderfluid." 87 Fed. Reg. 47,824, 47,867.

33.    The 2022 NPRM defines the Rule's prohibition on "gender identity" discrimination to require coverage and performance of "gender affirming care." "'[G]ender-affirming care' refers to care for transgender individuals (including those who identify using other terms, for example, nonbinary or gender nonconforming) that may include, but is not necessarily limited to, counseling, hormone therapy, surgery, and other services designed to treat gender dysphoria or support gender affirmation or transition." 87 Fed. Reg. at 47,834 n. 139. HHS has apparently adopted the standards of the World Professional Association for Transgender Health ("WPATH") as governing its interpretation of Section 1557. *See id.*; *see also id.* at 47,867 n. 416, 47,868 n. 423, 47,870 n. 448.

34.    Guidance from HHS's Office of Population Affairs defines "gender affirming care" to include:

| Affirming Care | What is it? | When is it used? | Reversible or not |
|---|---|---|---|
| **Social Affirmation** | Adopting gender-affirming hairstyles, clothing, name, gender pronouns, and restrooms and other facilities. | At any age or stage. | Reversible. |
| **Puberty Blockers** | Using certain types of hormones to pause pubertal development. | During puberty. | Reversible. |
| **Hormone Therapy** | Testosterone hormones for those who were assigned female at birth. Estrogen hormones for those who were assigned male at birth. | Early adolescence onward. | Partially reversible. |
| **Gender-Affirming Surgeries** | "Top" surgery – to create male-typical chest shape or enhance breasts. "Bottom" surgery – surgery on genitals or reproductive organs Facial feminization or other procedures. | Typically used in adulthood or case by-case in adolescence. | Not reversible. |

HHS Office of Population Affairs, Gender-Affirming Care and Young People, available at

https://opa.hhs.gov/sites/default/files/2023-08/gender-affirming-care-young-people.pdf    (last visited October 11, 2024).

35.    Abortion returned to the 2024 Rule when it restored "termination of pregnancy" to the definition of "[p]regnancy or related conditions." 89 Fed. Reg. at 37,576; *see also id.* ("A covered entity that chooses to provide abortion care but refuses to provide an abortion for a particular individual on the basis of a protected ground—such as race—would violate section 1557."); *id.* at 37,556 ("We clarify that a Nondiscrimination Policy's prohibition of sex discrimination encompasses protections afforded for various types of sex discrimination such as pregnancy, including termination of pregnancy or related conditions."); *id.* at 37,556 ("OCR has

concluded as a matter of statutory interpretation that section 1557 does not require the Department to incorporate the language of Title IX's abortion neutrality provision."); *id.* at 37,557 ("We note also that, as commenters suggested, this provision protects patients from discrimination on the basis of actual or perceived prior abortions."); *id.* at 37,606 ("To the extent plans offer coverage for termination of pregnancies and related services, they must do so on a nondiscriminatory basis."). The Fifth Circuit has previously explained that defining sex discrimination to include "termination of pregnancy" "require[s] that hospitals perform . . . abortions." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374 (5th Cir. 2022). This interpretation of Section 1557 also follows HHS's recent guidance to pharmacies, requiring pharmacies to stock abortion-inducing drugs pursuant to Section 1557.[4]

36.    The 2024 Rule also defines sex discrimination and sexual-orientation discrimination to include "fertility care," including procedures like IVF, surrogacy, and gamete donation. 89 Fed. Reg. at 37,577 (defining "fertility care" to include "IVF"). The Rule also requires covered entities to provide infertility treatments to non-married couples. *Id.* (stating that "if a covered entity elects to provide or cover infertility services but categorically denies them to same-sex couples, it may violate section 1557's prohibition on sex discrimination."). In other words, a Christian covered entity or employer must provide or cover IVF, surrogacy for all individuals, and must provide

---

[4] *See* Dep't of Health and Hum. Servs., Guidance to Nation's Retail Pharmacies: Obligations under Federal Civil Rights Laws to Ensure Nondiscriminatory Access to Health Care at Pharmacies (Sept. 29, 2023) ("An individual experiences an early pregnancy loss (first-trimester miscarriage) and their health care provider prescribes medication to assist with the passing of the miscarriage. If a pharmacy refuses to fill the individual's prescription—which is prescribed to manage a miscarriage or complications from pregnancy loss, because this medication can also be used to terminate a pregnancy—the pharmacy may be discriminating on the basis of sex."), *available at* https://www.hhs.gov/civil-rights/for-individuals/special-topics/reproductive-healthcare/pharmacies-guidance/index.html (last visited May 22, 2024).

infertility treatments that are otherwise in line with Christian belief for a non-married individual or a couple in a non-traditional relationship.

37.    The 2024 Rule's extension of Section 1557 to "gender identity," abortion, and infertility—coupled with its expansive definition of a "covered entity"—means that covered employers, insurance providers, third-party administrators ("TPAS"), PBMs, and other service providers are required to offer employee health plans covering gender transition services, abortions, and immoral infertility treatments notwithstanding a plan sponsor's exclusion of the same in its health plan.

38.    Although HHS disclaims an attempt to mandate standards of care for gender-transition services in its final rule, its proposed rule mentioned the clinical "guidelines" it expects covered entities will follow: the guidelines of the WPATH and Endocrine Society. 2022 NPRM, 87 Fed. Reg. at 47,868 (asserting that covered entities "should follow clinical practice guidelines and professional standards of care," and citing WPATH Standards of Care ("SOC") 7 & Endocrine Society Guidelines). HHS does not disavow that endorsement in the final rule or provide any examples of competing guidelines that would not require covered entities to support a "gender-transition."

39.    According to WPATH SOC 8, the purportedly medically necessary drug interventions for a gender transition include:

a.    Prescribing and administering puberty blockers off-label, and;

b.    Prescribing supraphysiological levels of cross-sex hormones off-label and related visits and tests.

13

40.    According to WPATH SOC 8, *supra*, at S18, S128, the purportedly "medically necessary" so- called "gender-affirming surgical procedures," include the following:

a.    "Hysterectomy" (removal of healthy uterus);

b.    "Mastectomy" (removal of healthy breasts);

c.    "Salpingo-oophorectomy" (removal of healthy ovaries and fallopian tubes);

d.    "Orchiectomy" (removal of healthy testicles);

e.    "Phalloplasty" (constructing penis-like structure using skin tissue), including "urethral lengthening," "prosthesis," "colpectomy" (closure of healthy vagina), "colpocleisis" (shortening of healthy vagina), and "scrotoplasty" (creating new scrotum);

f.    "Metoidioplasty" (constructing penis-like structure using tissue from a hormone-enlarged clitoris), including "urethral lengthening," "prosthesis," "colpectomy" (closure of healthy vagina), "colpocleisis" (shortening of healthy vagina), and "scrotoplasty" (creating new scrotum);

g.    "Vaginoplasty" (constructing vagina-like structure), including methods of "[penile] inversion" (using combination of skin surrounding penis and scrotal skin), "peritoneal [flaps pull-through]" (pulling down peritoneum (inner lining of abdominal wall) into space between rectum and urethra/prostate), and "intestinal" technique (using section of terminal large intestine);

h.    "Vulvoplasty" (constructing vulva-like structures);

i.    "Hair line advancement and/or hair transplant;"

j.    Facelift/mid-face lift (following alteration of the underlying skeletal structures);

14

k.    "Platysmaplasty" (neck lift);

l.    "Blepharoplasty" (eye and lid modification);

m.    "Rhinoplasty" (nose reshaping);

n.    "Cheek" surgery, including "implant[s]" and "lipofilling;"

o.    "Lip" surgery, including "augmentation" and "upper lip shortening;"

p.    "Lower jaw" surgery, including "augmentation" and "reduction of the mandibular angle" (cutting or shaving the corner of the lower jaw);

q.    "Chin reshaping" surgery;

r.    "Chondrolaryngoplasty" (shaving down Adam's apple);

s.    "Vocal cord surgery;"

t.    "Breast reconstruction" and "augmentation" (mammoplasty);

u.    "Body contouring" surgeries, including "liposuction," "lipofilling," and "implants" (such as "pectoral, hip, gluteal, [and] calf");

v.    "Monsplasty" (reduction of mons pubis tissue around the public bone, which is more pronounced in biological females);

w.    "Nipple-areola tattoo;"

x.    "Uterine transplantation" (uterus from donor);

y.    "Penile transplantation" (penis from donor);

z.    "Hair removal," including "laser epilation" (laser removal) or "electrolysis" (permanent removal by destroying hair follicles).

WPATH 8, *supra*, at S128.

15

41.    The 2024 Rule requires insurers, TPAs, pharmacy benefit managers ("PBMs"), and other service providers to cover abortions if the plan they administer offers analogous services in other contexts. For example, the 2024 Rule states: "A covered provider that generally offered abortion care could violate that prohibition if, for example, it refused to provide an abortion to a particular patient because of that patient's race or disability." 89 Fed. Reg. at 37,576. Thus, if a Christian healthcare provider would perform a surgery to save the life of the mother, the unintended effect of which is an abortion (*e.g.*, in the case of ectopic pregnancies), or would provide procedures to treat a miscarriage that could also be used for abortion, *see Religious Sisters of Mercy*, 513 F. Supp. 3d at 1124 ("The same concept theoretically applied for abortions. So if an obstetrician performed dilation and curettage procedures for miscarriages, then the 2016 Rule barred a later refusal to perform those procedures for abortions."), the 2024 Rule would require that healthcare providers also offer—and insurers, TPAs, PBMs, and other services providers also cover—elective abortions that violate the employer's or plan sponsor's religious beliefs.

42.    The 2024 Rule further requires insurers, TPAs, PBMs, and other service providers to cover artificial reproductive technologies such as IVF, surrogacy, and gamete donation for any individual, regardless of marital status. 89 Fed. Reg. at 37,577 ("OCR acknowledges the unique challenges faced by LGBTQI+ individuals seeking infertility treatment. Individuals are protected from discrimination regardless of the type of health care they seek.").

43.    In crafting the 2024 Rule, HHS and EEOC disregarded the commenters that asked HHS to make clear that health services need only be covered if they are deemed to be "medically necessary" or "medically appropriate" in the professional opinion of those charged with the care of the patient. For example, the 2024 Rule prohibits any categorical exclusion of "gender affirming

16

care." 89 Fed. Reg. at 37,701, to be codified at 45 C.F.R. § 92.207(b)(4). "When medically necessary treatments are categorically excluded when sought by transgender enrollees for purposes of gender-affirming care, but the same such treatments are covered for cisgender enrollees, such exclusions may deny transgender individuals access to coverage based on their sex." 89 Fed. Reg. at 37,671.

> **5.** **Covered employers, insurers, TPAs, PBMs, and other service providers are required to offer employee benefits covering abortion, gender transition services, and immoral infertility treatments**

44. The 2024 Rule, like the 2016 Rule, prohibits certain employers, health plans, insurers, TPAs, PBMs, and other services providers from exercising judgment as to what they cover. HHS stated: "When medically necessary treatments are categorically excluded when sought by transgender enrollees for purposes of gender-affirming care, but the same such treatments are covered for cisgender enrollees, such exclusions may deny transgender individuals access to coverage based on their sex." *Id*. at 37,671. And so Section 92.207(b)(4) and (5) of the 2024 Rule prohibits a covered entity from "[h]av[ing] or implement[ing] a categorical coverage exclusion or limitation for all health services related to gender transition or other gender-affirming care" or "[o]therwise deny[ing] or limit[ing] coverage, deny[ing] or limit[ing] coverage of a claim, or impos[ing] additional cost sharing or other limitations or restrictions on coverage, for specific health services related to gender transition or other gender-affirming care if such denial, limitation, or restriction results in discrimination on the basis of sex." 89 Fed. at 37,701. With "on the basis of sex" defined as including "termination of pregnancy" and infertility, the same applies to categorical exclusion of abortion and immoral infertility treatments.

45.     This conflict with religious employers extends beyond treatment related to gender dysphoria because some required procedures (such as elective hysterectomies) result in sterilization, and the 2024 Rule also extends to "termination of pregnancy." 89 Fed. Reg. at 37,576.

### 6.     Other requirements of the 2024 Rule

46.     The 2024 Rule requires that covered entities applying for federal financial assistance affirm beforehand that they will comply with the rule. 89 Fed. Reg. at 37,596, to be codified at 45 C.F.R. 92.5(a).

47.     The 2024 Rule requires covered entities to post notices regarding compliance with the 2024 Rule in conspicuous locations. 89 Fed. Reg. at 37,597-98, to be codified at 45 C.F.R. 92.10.

### B.     EEOC'S INTERPRETATION OF TITLE VII MANDATING COVERAGE OF GENDER TRANSITION SERVICES

48.     Congress enacted Title VII in 1964. Public Law 88-352, 78 Stat. 241 (July 2, 1964).

49.     Title VII makes it unlawful for an employer to discriminate against an employee or prospective employee "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

50.     Title VII defines an "employer" subject to its provisions as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b).

51.     Title VII has a broad religious exemption. It states that Title VII "shall not apply" to a religious organization's "employment of individuals of a particular religion." *See* 42 U.S.C. § 2000e-1(a). The statute defines "religion" broadly to include "all aspects of **religious observance and practice**, as well as belief." 42 U.S.C. § 2000e(j) (emphasis added).

52.     Although HHS's 2024 Rule directly applies only to "covered entities," it announces that the EEOC will enforce a similar rule against employers under Title VII. The 2024 Rule

declares that although HHS lacks jurisdiction over "employment practices," 89 Fed. Reg. at 37,552, it will "transfer matters to the EEOC or DOJ where OCR lacks jurisdiction over an employer," *id.* at 37,624, 37,627; *see also* 87 Fed. Reg. at 47,877 ("For example, OCR will transfer matters to the EEOC where OCR lacks jurisdiction over an employer responsible for the benefit design of an employer-sponsored group health plan."). HHS has decided that, for non-healthcare entities, Title VII is better suited to "address claims that an employer has discriminated in the provision of benefits, including health benefits, to its employees." *Id*. at 31,437.

53.    In the context of Title VII, the EEOC has adopted similar substantive standards as HHS. The EEOC interprets Title VII as prohibiting discrimination against employees on the basis of "gender identity." EEOC, Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity, question 4 (June 15, 2021).[5]

54.    The EEOC has specifically enforced this interpretation by requiring employee health plans to cover "medically necessary care based on transgender status." EEOC, Deluxe Financial to Settle Sex Discrimination Suit on Behalf of Transgender Employee, 2016 WL 246967 (Jan. 21, 2016) (noting that three-year consent decree with employer "provides that, as of January 1, 2016, [employer's] national health benefits plan will not include any partial or categorical exclusion for otherwise medically necessary care based on transgender status"); *see also Darin B. v. U.S. Office of Personnel Mgmt.*, EEOC Appeal No. 0120161068, 2017 WL 1103712 (Mar. 6, 2017) (arguing a transgender male complainant stated a cognizable claim of sex discrimination when he alleged that his Federal Employee Health Benefits insurance plan denied pre-authorization for nipple-areola

---

[5]    Available    at    https://www.eeoc.gov/laws/guidance/protections-against-employment-discrimination-based-sexual-orientation-or-gender.

reconstruction; the failure to use or exhaust the process for Agency review of an insurance carrier's decision does not preclude an employee from asserting a viable claim in the EEO process).

55.    Dignity Health, one of the largest healthcare systems in the United States, includes many Catholic hospitals. It has now merged with Catholic Health Initiatives to form Common Spirit Health. In June 2016, Josef Robinson, a transgender male, sued Dignity Health for maintaining an employee health plan that categorically excluded coverage for gender transition services. Robinson's complaint asserted a violation of Title VII, claiming that "[d]iscrimination on the basis of transgender status or gender nonconformity is discrimination on the basis of 'sex' under Title VII," and that the hospital's exclusion of transgender surgery constituted a violation of Section 1557 of the Affordable Care Act. EEOC filed an amicus brief in the case in support of Robinson, arguing that the employer's transgender exclusion violated Title VII by denying Robinson "access to medically necessary treatment for his gender dysphoria, a serious health condition directly related to the fact that he is transgender." Amicus Brief of EEOC in Support of Plaintiff, *Robinson v. Dignity Health*, 16-cv-03035 YGR (N.D. Cal.) (filed Aug. 22, 2016).[6]

56.    The EEOC has taken enforcement action against other employers for the "categorical exclusion" from their health plans of "services related to transgender treatment/sex therapy." Soc'y for Human Res. Mgmt., Wal-Mart Loses Perfect LGBTQ Rating Because of Transgender Harassment, Nov. 30, 2017.[7]

---

[6]Available at https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/litigation/briefs /robinson.html.

[7]    Available at    https://www.shrm.org/resourcesandtools/legal-and-compliance/employment-law/pages/wal-mart-lgbtq-rating.aspx.

57.    Courts have recently interpreted Title VII consistent with the EEOC position that health insurance coverage for transgender services such as vaginoplasty could not be excluded. *See Lange v. Houston Cnty., Georgia*, 101 F. 4th 793, 795–96 (11th Cir. 2024) ("This appeal requires us to determine whether a health insurance provider can be held liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, for denying coverage for gender-affirming care to a transgender employee *because* the employee is transgender. We hold that it can.").

58.    In *Lange*, the United States filed an *amicus* brief in support of the plaintiff in that case, who alleged discrimination under Title VII by her employer for its categorical exclusion of "gender-affirming care" from the employer's health plan. Brief for the United States as Amicus Curiae Supporting Plaintiff-Appellee and Urging Affirmance on the Issues Addressed Herein, *Lange v. Houston Cnty., Georgia*, No. 22-13626, (Mar. 17, 2023), attached here as Exhibit A. In that brief, the United States argued that an employer-sponsored health insurance plan violates Title VII if it excludes coverage for medical treatments only when they are needed to provide gender-affirming care." *Id.* at 10. The United States filed this brief because of its "substantial interest . . . [in] the proper application of the prohibition on sex discrimination in Title VII . . . to an employer's denial of health insurance benefits to a transgender worker" in light of EEOC's and DOJ's "enforcement authority under Title VII." *Id.* at 1–2.

59.    Accordingly, it is the policy and official position of the EEOC, based on the EEOC's statements and the agency's actual enforcement actions, that exclusion of gender-transition coverage in employee health plans constitutes a violation of Title VII's ban on "sex" discrimination.

### C.  EEOC'S PREGNANT WORKERS FAIRNESS ACT RULE MANDATING ACCOMMODATION OF ABORTION AND IVF

#### 1.  PWFA Statute

60.    Congress passed the PWFA with a bipartisan coalition to provide protection for pregnant women seeking workplace accommodations. Prior to this law, federal protections for pregnant workers were limited and patchwork.

61.    There is limited coverage for pregnancy discrimination in Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978 (PDA). Title VII's prohibition on discrimination "because of . . . sex" includes actions taken "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). And women "affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." *Id.*

62.    Title VII does not require employers to affirmatively accommodate women's pregnancies, childbirth, or pregnancy-related medical conditions unless the employer provides the accommodation to comparator workers who are limited in their ability to work for reasons unrelated to pregnancy. *See Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 229–30 (2015).

63.    The Americans with Disability Act (ADA) requires accommodations for employees experiencing a qualifying disability, 42 U.S.C. S 12112(a), but the ADA in general does not treat pregnancy itself as a qualifying disability. *See Gudenkauf v. Stauffer Commc'ns, Inc.*, 922 F. Supp. 465, 473 (D. Kan. 1996) (collecting cases).

64.    The Family Medical Leave Act (FMLA) provides for women to take up to 12 weeks of unpaid leave for a serious health event, including pregnancy or childbirth. 29 U.S.C.

§ 2612(a)(l)(D). FMLA only applies, however, when the woman has previously worked for the employer for 12 months and employers may terminate the employee taking leave if they do not return at the end of the 12 weeks. 29 USC S 2611 § (2)(A).

65.    To address these gaps in coverage for pregnant women in the workplace, Congress passed the PWFA in December 2022. *See* Consolidated Appropriations Act, 2023, div. II, Pub. L. No. 117-328, 136 Stat. 4486, 6084 (2022). The PWFA aimed to protect pregnant women in the workforce by requiring employers to provide workplace accommodations for "pregnancy, childbirth, or related medical conditions." *Id.* § 2000gg(4).

66.    Under the PWFA, employers are required to accommodate any "known limitation related to the pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg-1(1). A known limitation is defined as a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." *Id.* § 2000gg(4).

67.    As a PWFA co-sponsor, Senator Cassidy highlighted that the sponsors of the legislation understood that the PWFA did not apply to abortion, as clearly expressed by Democrat co-sponsor Bob Casey's statement that "under the act . . . the EEOC, could not—could not—issue any regulation that requires abortion leave." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022) (Sen. Casey statement). In the face of an unmistakable decision by Congress not to mandate leave for abortion as part of the PWFA, the EEOC did just that.

68.    In fact, no member of Congress who supported the PWFA ever claimed the law would cover abortion. And given the well-known political realities, if the proposed law would have included abortion, it would have drastically changed the bi-partisan coalition of support for the PWFA.

69.    The PWFA requires employers to engage in an "interactive process" with employees to "determine the appropriate reasonable accommodation." 42 U.S.C. § 2000gg(7).

70.    The PWFA prohibits employers from taking adverse employment actions or denying employment opportunities because an employee requested a reasonable accommodation. The PWFA and the PWFA Rule prohibit:

a.    Refusing to make a reasonable accommodation for a qualified employee, 42 U.S.C. § 2000gg-1(1), PWFA Rule at 29,186, to be codified at 29 C.F.R. § 1636.4(a)(1);

b.    Unnecessarily delaying providing a reasonable accommodation, PWFA Rule at 29,186, to be codified at 29 C.F.R. § 1636.4(a)(1);

c.    Giving an ultimatum that the employee must accept the accommodation that it offers, PWFA Rule at 29,187, to be codified at 29 C.F.R. § 1636.4(a)(2);

d.    Insisting that the employee provide supporting documentation in support of her request for an accommodation, PWFA Rule at 29,187, to be codified at 29 C.F.R, § 1636.4(a)(3);

e.    Requiring an employee to accept an accommodation other than one arrived at through the interactive process, 42 U.S.C. § 2000gg-1(2); PWFA Rule at 29,187, to be codified at 29 C.F.R, § 1636.4(b);

f.    Failing to provide an accommodation that will give the employee "an opportunity to attain the same level of performance, or to enjoy the same level of benefits and privileges" as her peers without a known limitation, PWFA Rule at 29,187, to be codified at 29 C.F.R. § 1636.4(a)(4);

g.     Denying employment opportunities to a qualified employee "if such denial is based on the need, or potential need" of the employer to make a reasonable accommodation, 42 U.S.C. § 2000gg-1(3); PWFA Rule at 29,187, to be codified at 29 C.F.R. § 1636.4(c);

h.     Requiring a qualified employee to take leave when another reasonable accommodation can be provided, 42 U.S.C. § 2000gg-1(4); PWFA Rule at 29,187, to be codified at 29 C.F.R. (§ 1636.4(c)(1);

i.     Taking an adverse action against an employee because she requested an accommodation under the Act, 42 U.S.C. § 2000gg-1(5); PWFA Rule at 29,187, to be codified at 29 C.F.R. § 1636.4(e)(1); and

j.     Retaliating against an employee or coercing her for opposing unlawful discrimination under the [Act] or participating in a proceeding under the [Act], 42 U.S.C. § 2000gg-2(f)(1) and (f)(2); PWFA Rule at 29,188, to be codified at 29 C.F.R. §§ 1636.1(6) and 1636.5(f).

71.     A reasonable accommodation might include: enhanced accessibility to the workplace; job restructuring (*e.g.*, part-time status or reassignment to vacant position); remote work and telework; the option to change worksites, to take bathroom, food, or hydration breaks; lifting devices; accessing paid leave; preferred parking; unpaid time off for medical appointments or childbirth; and more. *See generally* PWFA NPRM, 88 Fed. Reg. at 54,768 (listing accommodations); PWFA Rule, 89 Fed. Reg. at 29,184, to be codified at 29 C.F.R. § 1636.3(h).

72.     A "qualified employee" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C.A. § 2000gg(6). She

remains "qualified" notwithstanding her "inability to perform an essential function . . . for a temporary period;" that "[t]he essential function [cannot] be performed [until] the near future;" or that "[t]he employee cannot perform the essential functions unless she is "reasonably accommodated." *Id.*

73.    The PWFA applies to employers with fifteen or more employees. 42 U.S.C.A. § 2000gg(2)(B).

74.    The PWFA provides for private enforcement actions from private parties once administrative procedures have been exhausted. In addition, the EEOC has investigative and enforcement powers akin to those in Title VII. 42 U.S.C. § 2000gg-2(a)(1).

### 2.    PWFA Proposed Rule

75.    The PWFA directed the EEOC to adopt a rule to implement the PWFA and provide examples of reasonable accommodations by December 29, 2022. 42 U.S.C.A. § 2000gg-3(a).

76.    On August 11, 2022, the EEOC promulgated a proposed rule. Regulations to Implement the Pregnant Workers Fairness Act, 88 Fed. Reg. 54,714 ("PWFA NPRM").

77.    The PWFA NPRM proposed defining "pregnancy, childbirth, and related medical conditions" as including termination of pregnancy, abortion, and infertility treatments.  PWFA NPRM at 54,767.

78.    This unnatural interpretation of the PWFA lacks any basis in the text of the statute which says nothing about abortion or IVF treatment. Likewise, the expansion of the PWFA to cover activities widely recognized as inconsistent with the Christian values contradicts the robust legislative history that evinces a broad coalition of bipartisan supporters, including the United States Conference of Catholic Bishops, who understood that the pro-woman and pro-baby

legislation had nothing to do with abortion or infertility treatments many Christians consider immoral.

79.    The NPRM generated substantial comments opposing the radical expansion of the PWFA statute to include abortion and immoral infertility treatments like IVF. As the EEOC recognized, approximately 54,000 comments urged "the Commission to exclude abortion from the definition of 'pregnancy, childbirth, or related medical conditions.'" 89 Fed. Reg. 29,096, 29,104.

80.    The PWFA Rule stated that "pregnancy, childbirth, or related medical conditions" includes "termination of pregnancy . . . via abortion" and infertility treatment. *Id.* at 29,183 to be codified as 29 C.F.R. § 1636.3(b). Comments critical of the EEOC's proposed abortion accommodation revision included many key supporters of the PWFA legislation, such as lead sponsor Senator Bill Cassidy; other leading legislative proponents, like Representative Virginia Foxx; as well as the United States Conference for Catholic Bishops, The Christian Employers Alliance, Comment Letter on PWFA Proposed Rule, 2 (Oct. 10, 2023), https://downloads.regulations.gov/EEOC-2023-0004-97876/attachment_1.pdf; and The Alliance Defending Freedom, Comment Letter on PWFA Proposed Rule, 4-9 (Oct. 2, 2023), https://downloads.regulations.gov/EEOC-2023-0004-49357/attachment_1.pdf.

81.    The moral implications of mandating employer accommodation of abortion and immoral infertility treatments are immense as they require covered employers to support and devote resources, including by providing extra leave time, for employees seeking to terminate fetal life.

### 3.    PWFA Rule

82.    On April 19, 2024, the EEOC published the final rule. Implementation of the Pregnant Workers Fairness Act, 89 Fed. Reb. 29,096 ("PWFA Rule").

83.    The EEOC was unphased by the overwhelmingly broad opposition to the NPRM adding abortion to the PWFA. The PWFA Rule mentions "abortion" 348 times, and proceeds with imposing the abortion and immoral infertility treatment accommodation mandates.

84.    As in the PWFA NPRM, the EEOC expanded the definition of "pregnancy, childbirth, or related medical conditions" to include "termination of pregnancy, including … abortion" and "fertility treatment" *See* 89 Fed. Reg. at 29,183, to be codified at 29 CFR § 1636.3(b). Infertility treatment, according to the EEOC, includes treatments for infertility treatments considered immoral by many Christians (like IVF). *Id*. at 29,102, 29,190.

85.    Two EEOC commissioners did not vote for the PWFA Rule, and one published a rare statement expressing dissent from the 3-2 final vote. Commissioner Andrea Lucas concluded the PWFA Rule "cannot reasonably be reconciled with the text" of the PWFA. Statement at 1, https://www.linkedin.com/posts/andrea-lucas-a5b27513_a-lucas-statement-re-vote-re-pwfa-final-activity-7185711161609232387-GtB1/. And the "Commission paradoxically interprets a statute requiring employers to accommodate a worker's pregnancy and childbirth into a provision that also requires accommodation of a worker's inability to become pregnant." *Id*. at 7.

86.    Contrary to the plain meaning of the PWFA text and legislative history, the EEOC contends the "plain meaning" of "pregnancy, childbirth, or related medical conditions', 89 Fed. Reg. at 29,106, requires abortion to be covered since it has interpreted 'pregnancy, childbirth, or related medical conditions' in Title VII to include the decision to have—or not to have—an abortion." *Id*. This, the Commission reasoned, reflects the "plain meaning" of the phrase since

28

"[b]y definition, individuals who are choosing whether or not to have an abortion are pregnant." *Id.*

87.   This meaning, interpreting a "known limitation" that "relates to pregnancy, childbirth, or related medication conditions" to include abortion, was not plain to any supporter of the PWFA in Congress. The intentional termination of pregnancy is not a limitation or condition relating to pregnancy.

88.   Because EEOC expanded the PWFA to require accommodation for abortion and IVF, the prohibition against retaliation, under the EEOC's interpretation of the PWFA, restricts speech activity related to abortion and IVF.

89.   EEOC interprets the PWFA prohibition on harassment as applying to employee handbooks or policies that reject any effort to seek an abortion. It also may require employees to limit speech that would oppose any employee seeking an accommodation for getting an abortion or seeking immoral infertility treatment as a form of prohibited "harassment."

90.   The PWFA Rule requires an employer to engage in an interactive process with its employee when the employer learns that the employee is considering or seeking abortion or any immoral infertility treatment.  This is required so the employer might "determine the appropriate reasonable accommodation."  PWFA Rule at 29,184, to be codified at 29 C.R.F. § 1636.3(h)(3).

91.   A consequence of this required "interactive process" is that a Christian employer is more likely to become aware of an employee's immoral actions that, before the PWFA, might have remain undisclosed. And the EEOC would view taking an adverse action against the employee in this situation as running afoul of the anti-retaliation provision in the PWFA. This is because "a request for a reasonable accommodation" would cover abortion, and the request would

"constitute activity" under the retaliation prohibition of 42 U.S.C § 2000gg-2. *See* 89 Fed. Reg. at 29,188. The PWFA, according to the EEOC, would prohibit Plaintiffs from disciplining an employee or taking any adverse action on account of the employee seeking and obtaining an abortion or IVF, requesting resources in the form of an accommodation to get an abortion or IVF, encouraging other employees to seek an abortion or IFV, or speaking out against the Plaintiffs' religious policies with regard to abortion.

92.   Since the PWFA Rule was published, several states and religious groups have filed legal challenges to the rule. *See Texas v. Garland*, --- F.Supp.3d ---, 2024 WL 967838 (N.D. Tex. Feb. 17, 2014) (enjoining administrative or other adjudication of PWFA claims against State of Texas because Congress, having passed the bill through proxy voting, violated the quorum rule in U.S. Const., art. I, sec. 5); *Tennessee et al v. EEOC*, No. 24-cv-84 (E.D. Ark. April 25, 2024); *Louisiana et al. v. EEOC*, No. 24-cv-00629 (W.D. La. May 13, 2024); *United States Conference of Catholic Bishops et al. v. EEOC*, No. 24-cv-691 (W.D. La. May 22, 2024); *Catholic Benefits Ass'n v. Burrows*, --- F.Supp.3d ---, 2024 WL 4315021 (D.N.D. September 23, 2024) (enjoining EEOC from administering or enforcing PWFA Rule or EEOC Guidance with regard to mandates related to abortion, immoral fertility treatments, gender ideology speech codes, or access to single-sex bathrooms by those of the opposite sex).

### D.   EEOC'S GUIDANCE REGARDING HARASSMENT MANDATING ACCESS TO BATHROOMS AND OTHER SINGLE-SEX SPACES AND IMPOSING GENDER IDEOLOGICAL SPEECH

93.   Concurrent with EEOC promulgating the PWFA Rule on April 19, 2024, it adopted its Harassment Guidance under Title VII that *inter alia* purports to make certain transgender conflicts subject to Title VII employment discrimination protections. *See* EEOC Enforcement

Guidance on Harassment in the Workplace, § II(A)(5) (April 29, 2024), https://www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-workplace ("Harassment Guidance").

94.    Title VII makes it unlawful for an employer to "discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Discrimination "because of . . . sex" has long covered sexual harassment. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986).

95.    The Harassment Guidance addresses many scenarios that may properly be understood as violating Title VII's prohibition on employment discrimination. The EEOC, however, also sought to expand Title VII to cover potential employment conflicts for areas unrelated to "sex" discrimination that would burden sincere religious beliefs of many employers, including Plaintiffs.

96.    In particular, the Harassment Guidance seeks to apply Title VII to cover three scenarios that contravene Plaintiffs' sincere Christian beliefs about human sexuality, namely: (1) the use of private spaces traditionally reserved to single sex; (2) the use of pronouns contrary to biological sex; and (3) the ability to speak truthfully about human sexuality. *See* Harassment Guidance at ¶ II(A)(5)(c), (b).

97.    As to the use of private spaces traditionally reserved for a single sex, the EEOC interprets Title VII as prohibiting "harassing conduct" on the basis of "gender identity" to include "the denial of access to a bathroom or other sex-segregated facility consistent with the individual's gender identity." *Id.* & n.43. Access to a bathroom traditionally reserved to one sex by

a member of the opposite sex is given emphasis: "In addition to being part of a harassment claim, denial of access to a bathroom consistent with one's gender identity may be a discriminatory action in its own right and should be evaluated accordingly." *Id.*

98.    Thus a Christian business, school, or employer may not insist on reserving private spaces for use by a single-sex, such as a bathroom or locker room, without fear of engaging in unlawful conduct as recently interpreted by the EEOC Harassment Guidance.

99.    The Harassment Guidance likewise mandates speech contrary to Christian values through its false pronoun requirement. The EEOC interprets Title VII to prohibit the "intentional use of a name or pronoun inconsistent with the individual's known gender identity (misgendering)" *Id.* & n.42. The Harassment Guidance continues with "Example 15: Harassment Based on Gender Identity," defined to include "misgendering" as a basis for harassment liability.

100.    The EEOC also prohibits employer speech consistent with Christian values through its Harassment Guidance and its PWFA Rule anti-retaliation provision.

101.    Under the PWFA Rule, the EEOC requires employers to engage in conversation (called the "interactive" process) with their employees who desire an accommodation for the protected procedures. PWFA Rule at 29,128, 29,189, to be codified at 29 C.F.R. § 1636.3(h)(2).

102.    The PWFA Rule then bars an employer from taking an adverse action or retaliating against the employee even though she may have disclosed her speech or conduct at odds with the Employer's Christian values. 42 U.S.C. § 2000gg-1(5); PWFA Rule 29,187, to be codified at 29 C.F.R. § 1636.4(e)(1); 42 U.S.C. § 2000gg-2(f)(1); PWFA Rule at 29,188, to be codified at 29 C.F.R. §§ 1636.1(6) and 1636.5(f).

103.   The EEOC's Harassment Guidance functions similarly. The EEOC interprets Title VII to prohibit "harassment based on a woman's decision about contraception or abortion." Harassment Guidance at II.A.5.b. Because the EEOC also protects employees' decisions related to immoral infertility treatment and gender transition, the EEOC will treat communications aligned with Christian values and critical of certain employees' choices about these subjects as constituting harassment.

104. Accordingly, through its PWFA Rule, its Harassment Guidance, and its interpretations of the PWFA and Title VII, it is the EEOC's policy and official position that Christian employers' communications, policies, and practices declining to use false pronouns or describing, teaching, or preaching Christian values, and their preservation of private spaces to one sex may constitute a violation of the PWFA or Title VII.

105.   While the EEOC says its Harassment Guidance is "not meant to bind the public in any way," it also serves as a substantive resource and guidance when the EEOC and members of the public are assessing the merits of a claim based on harassment and whether to bring enforcement action. The Guidance is a "resource" for EEOC and other federal agencies when "adjudicat[ing]" and "litigat[ing] harassment claims." *Id.* at ¶ I(A). In practice, it reflects the official position of the EEOC in future enforcement actions. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, (1986) ("while not controlling upon the courts by reason of their authority, [they] do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance") (citation omitted); *Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809, 815 (6th Cir. 2012) (describing EEOC guidance under ADA as "very persuasive authority").

### E.    ENFORCEMENT MECHANISMS FOR THE IMMORAL FEDERAL MANDATES

106.    The 2024 Rule subjects "covered entities" to enforcement actions brought by HHS's Office of Civil Rights. If the Director of OCR concludes that a covered entity discriminated on the basis of "gender identity," "sexual orientation," or "termination of pregnancy," the entity would have to take "remedial action . . . to overcome the effects of the discrimination." 89 Fed. Reg. at 37,696, to be codified at 45 C.F.R. § 92.6(a)(1). If it refuses, OCR could initiate an administrative procedure to terminate the entity's HHS funding. 89 Fed. Reg. at 37,664.

107.    The 2024 Rule empowers OCR to compel covered entities to record and submit compliance reports under Section 1557, 89 Fed. Reg. at 37,664.

108.    Under the 2024 Rule, where HHS does not have jurisdiction over an alleged discriminatory act, the agency said it would refer the matter to the EEOC for enforcement under Title VII. 89 Fed. Reg. at 37,626. Similar to HHS's authority under Section 1557, the EEOC has authority to investigate alleged Title VII violations and will ask violators to voluntarily take corrective action for the discriminatory behavior. 42 U.S.C. § 2000e-5(a).

109.    The powers, remedies, and procedures provided to the EEOC and private plaintiffs for Title VII violations are the same as those for PWFA violations.  42 U.S.C. § 2000gg-2.

110.    If HHS or EEOC are dissatisfied with an entity's corrective remedial actions, the 2024 Rule permits referral of the matter to the Department of Justice to bring a federal lawsuit to enforce federal civil rights laws. *See, e.g.*, 89 Fed. Reg. at 37,664.

111.    Title VII creates a private right of action. And in the 2024 Rule, HHS also interpreted Section 1557 as authorizing a private right of action. *See* 89 Fed. Reg. at 37,654. This means that

individuals who believe they have been discriminated against on the basis of gender identity may bring their own federal lawsuits. These laws can also be enforced by class action suits.

112. Sanctions for failing to comply with the 2024 Rule are severe. They include compensatory damages, punitive damages, treble damages, civil penalties, attorney fees, injunctive relief, and even loss of federal funding.

113. **Loss of federal funding**: Entities subject to the 2024 Rule risk the denial or discontinuance of federal funding if they do not comply. 89 Fed. Reg. at 37,664. HHS Form 690 makes compliance "a condition of continued receipt of Federal financial assistance" and authorizes the government "to seek judicial enforcement of this assurance." Assurance of Compliance, U.S. Dep't of Health and Hum. Servs., https://www.hhs.gov/sites/default/files/form-hhs690.pdf. (last visited May 22, 2024).

114. **Civil and criminal penalties; treble damages**: Covered entities that submit HHS Form 690 but do not comply with the 2024 Rule could be liable under the False Claims Act, which authorizes a civil penalty of up to $11,000 for each false claim, "plus 3 times the amount of damages which the Government sustains because of" the false claim. 31 U.S.C. § 3729(a)(1). False claims related to a health program may also subject responsible persons to fines and up to five years imprisonment under 18 U.S.C. § 1035(a).

115. **Compensatory damages**: Christian employers that violate the 2024 Rule may be subject to compensatory damages under Section 1557 or under Title VII. 89 Fed. Reg. at 37,654 ("The enforcement mechanisms available for and provided under . . . Title IX . . . shall apply for purposes of Section 1557."); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992) (compensatory damages available under Title IX); 42 U.S.C. § 1981a(b)(3) (compensatory

damages available under Title VII). Compensatory damages may include pecuniary losses and even nonpecuniary losses such as "emotional pain" and "mental anguish." 42 U.S.C. § 1981a(b)(3); *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 954 (7th Cir. 1998).

116. **Punitive damages**: Punitive damages are available under Title VII if the employer acted "with malice or with reckless indifference to the federally protected rights" of an employee. 42 U.S.C. § 1981a(b)(1). Punitive damages are subject to the same statutory caps that are imposed for nonpecuniary losses. *See id.* § 1981a(b)(3).

117. **Injunctive relief**: Courts may order broad forms of injunctive relief under Title VII— *see* 42 U.S.C. § 2000e-5(g)(1); *United States v. Criminal Sheriff, Parish of Orleans*, 19 F.3d 238, 239 (5th Cir. 1994)—and may even mandate that employers adopt certain policies—*see, e.g.*, *Morris v. Am. Nat'l Can Corp.*, 730 F. Supp. 1489, 1498 (E.D. Mo. 1989), *aff'd in part, rev'd in part on other grounds*, 952 F.2d 710 (8th Cir. 1991); *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1541 (M.D. Fla. 1991). Title IX, and hence Section 1557, also permits broad injunctive relief. *See Roberts v. Colo. State Bd. of Agriculture*, 998 F.2d 824, 833 (10th Cir. 1993).

118. **Attorney's fees**: Under Title VII and Section 1557, a prevailing party is entitled to costs and attorney's fees. *See* 42 U.S.C. § 2000e 5(k); *id.* § 1988(b).

## IV.    PARTIES

### A.    PLAINTIFFS

#### 1.    Dr. James Dobson Family Institute

119.    Dr. James Dobson incorporated JCD Family Forum, now known as The Dr. James Dobson Family Institute ("JDFI"), as a nonprofit corporation and Christian ministry in 2009.

120.    Dr. Dobson holds a Ph.D. in child development from the University of Southern California. He taught at the University of Southern California Medical School for fourteen years. Dr. Dobson has advised four presidents on family matters, and he has been honored to receive eighteen honorary doctorates. For more than 40 years, he has been providing life-changing family resources. He is the author of over fifty books dedicated to the preservation of the family, including *Your Legacy, The New Dare to Discipline*, *Love for a Lifetime, Life on the Edge*, *Love Must Be Tough*, *The New Strong-Willed Child*, *When God Doesn't Make Sense*, *Bringing Up Boys*, *Marriage Under Fire*, *Bringing Up Girls*, and *Head Over Heels*.

121.    JDFI promotes and teaches biblical principles that support marriage, family, children, parenting, religious freedom, and Christian evangelism. It serves families with broadcasts, monthly newsletters, feature articles, videos, blogs, books, and other resources available on demand via its website, mobile apps, and various social media platforms.   JDFI, OUR MISSION (available at https://www.drjamesdobson.org/our-mission). JDFI's ministry has four core divisions consisting of Family Talk, the Dobson Culture Center, and the Dobson Digital Library, and the Dobson Policy Center.

122.    JDFI's core Christian beliefs are set forth in its Statement of Faith. Those beliefs include, among others, that the Bible is the inspired Word of God, the divinity of Jesus Christ and

his vicarious and atoning death, the resurrection, and the spiritual unity of Christian believers. Ex. B-1, JDFI Sixth and Restated Bylaws ("JDFI Bylaws"), art. I.

123.  JDFI's purposes are:

- To preserve and promote the institution of the family;

- To preserve and promote the institution of marriage;

- To preserve and promote parenthood and sound parenting;

- To educate husbands, wives, fathers, mothers, and children and to give them Christ-oriented counsel;

- To protect and promote the sanctity of human life;

- To encourage righteousness in the culture; and

- To introduce as many as possible to the Gospel of Jesus Christ.

Ex. B-2, JDFI Certificate of Second Amendment and Restatement of Articles of Incorporation of the Dr. James Dobson Family Institute ("JDFI Articles"), art. II.

124.  Every JDFI director satisfies the requirements for directors stated in JDFI's Bylaws, *viz.*, each is a "baptized, professing Christian, and member of a Christian Church. Each . . . affirm[s] and support[s] the Ministry's purposes, the Dr. James Dobson Family Institute Mission Statement, the Dr. James Dobson Family Institute Covenant, and the Dr. James Dobson Family Institute Statement of Faith." Ex. B-1, JDFI Bylaws, art. 3.5.

125.  JDFI's Chairman, Vice-Chairman, President, Secretary, and Treasurer are also Christians, and they satisfy the same requirements as those for directors. *Id.*, art. 4.1.

126.  All JDFI employees are professing Christians. As part of JDFI's employment application, prospective employees must acknowledge that he or she has "read, understand[s], and

38

agree[s] with all parts of the JDFI Statement of Faith and Mission Statement" and affirm that "[i]f hired, I agree to uphold these beliefs in my personal, daily life and to help JDFI pursue its mission." Ex. B-3, JDFI Employment Application.

127.   JDFI's Employee Manual explains that "JDFI expressly reserves the right, as a religious corporation, to base its hiring practices on the religious affiliation, Christian lifestyle, and conviction of its applicants that are consistent with its core values." Ex. B-4, JDFI Employee Manual at 4–7, 11.

128.   Because of its Biblically informed values, JDFI believes that it should, as much as possible, provide its full-time employees with health care benefits. It also believes that its health care coverage cannot include surgical or chemical abortion, infertility treatments that destroy human life, or gender transition medications or surgeries. It also cannot and will not knowingly assist or accommodate employees in acquiring such drugs or services, and it cannot and will not use the language of gender ideology, including false pronouns, because all of these things are contrary to JDFI's Christian values.

129.   In his declaration attached and incorporated herein as Exhibit B, Dr. Owen Strachan, JDFI's Director of Culture, has explained in detail JDFI's biblically based values with regard to these subjects in his declaration.

130.   JDFI has over thirty employees and, therefore, is an "employer" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b), and the Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg(2).

131.    JDFI maintains a partially self-insured group plan for its employees, in which the organization acts as its own insurer. JDFI has contracted with a stop-loss provider and a third-party administrator.

132.    Approximately twenty-nine of JDFI employees are enrolled in its health plan. Approximately fifty-eight dependents of employees are covered. The plan thus covers approximately eighty-seven individuals.

133.    The AGT Mandate is causing JDFI injury because it prohibits JDFI from devising a health plan according to its religious beliefs. Consistent with its religious commitments, JDFI's employee health plan excludes surgical and chemical abortion, drugs or devices that may destroy the life of an embryo (either before or after) implantation (including IUDs, "emergency contraception," Plan B, and Ella), and any form of "gender-affirming care." The plan also excludes coverage for any counseling or referrals to promote or refer for abortion, immoral infertility treatment, or "gender-affirming" care.

134.    If JDFI, its employee health plan, its third party administrator, its pharmacy benefit manager, or its other health plan service providers were required to provide coverage for abortion, immoral infertility treatments (including IVF, gamete donation, or surrogacy), or gender transition services, it would violate JDFI's religious values, scandalize its employees and supporters, and otherwise compromise its religious mission.

135.    The immoral mandates in the PWFA Rule and the Harassment Guidance also injure JDFI because they require JDFI either to change its policies and practices in ways contrary to its Christian values (and thereby engage in harmful and scandalous conduct) or they subject JDFI to the government enforcement actions described above.

136.  JDFI does not and will not provide any workplace accommodation for an employee to obtain an abortion, an immoral infertility treatment, or gender transition services.

137.  JDFI does not and will not provide any workplace accommodation for an employee to obtain an abortion, an immoral infertility treatment, or gender transition services.

138.  JDFI will take appropriate adverse employment action against any applicant or employee who encourages another person to obtain an abortion, immoral infertility treatment, or transgender affirmation.

139.  JDFI will take appropriate adverse employment action against any applicant or employee who, by any means, encourages another person to obtain an abortion, immoral infertility treatment, or transgender affirmation.

140.  JDFI will take appropriate adverse employment action against any applicant, employee, or former employee whose speech, advocacy, or conduct undermines JDFI's values about abortion, immoral infertility treatments, or transgender affirmation.

## 2.    USATransForm d/b/a United in Purpose

141.  USATransForm dba United in Purpose ("UIP") is a Texas nonprofit corporation and Christian ministry with its principal office in Southlake, Texas.

142.  UIP has fifteen or more employees and, therefore, is an "employer" within the meaning of PWFA, 42 U.S.C. § 2000gg(2), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

143.  UIP's core Christian beliefs are set forth in its Statement of Faith and Statement of Beliefs located in the first article of its Fourth Amended and Restated Bylaws ("UIP Bylaws") attached as Exhibit C. They include, among others, belief in the Bible as the inspired Word of God;

41

belief in "one God, eternally existent in three persons;" in the divinity of Jesus Christ and his vicarious and atoning death, in his ascension and resurrection; and in the spiritual unity of Christian believers.

144.   UIP's Statement of Faith includes these statements:

1.1.9.   We believe God's plan for human sexuality is to be expressed only within the context of marriage, that God created man and woman as unique biological persons made to complete each other. God instituted monogamous marriage between male and female as the foundation of the family and the basic structure of human society. For this reason, we believe that marriage is exclusively the union of one genetic male and one genetic female. Genesis 2:24; Matthew 19:5-6; Mark 10:6-9; Romans 1:26-27; 1 Corinthians 6:9.

1.1.11.   We believe that human life is sacred from conception to its natural end; and that we must have concern for the physical and spiritual needs of our fellowmen. Psalm 139:13; Isaiah 49:1; Jeremiah 1:5; Matthew 22:37-39; Romans 12:20-21; Galatians 6:10.

Ex. C, Bylaws, arts. 1.1.9 and 1.1.11.

145.   UIP's Statement of Beliefs includes this provision:

1.2.2 Sexuality. We believe consistent with Biblical principles, sexuality and the divinely prescribed boundaries for the expression thereof is covered clearly in the Holy Scriptures, which limit sexual contact to the marital relationship. Homosexual acts, adultery, bestiality, and all forms of fornication are categorically condemned in the Holy Scriptures. See 1 Cor. 6:18; 1 Thes. 4:3; Rom. 1:26-27; Prov. 5:3-5, 8-13; 7:21-27; Gal. 5:19; Exodus 20:14; Deut. 5:18; Matt. 5:27; 19:18; Luke 18:20; Rom. 13:9; James 2:11; Lev. 20:10-21; 1 Cor. 10:8; 6:18; Jude 7. Furthermore, the Ministry believes that sexuality is assigned by God at birth, and the Holy Scripture does not permit an individual to alter his or her sexual identity physically or otherwise.

Ex. C, Bylaws, art. 1.2.2.

146.   Plaintiffs affirm Dr. Owen Strachan's further explanation of UIP's biblical values with regard to the subjects in his declaration that is attached as Exhibit B; *see also* Declaration of Michael Seifert, CEO of Public Square, attached as Exhibit E, ¶ 21, incorporating Dr. Strachan's declaration.

147.    The AGT Mandate imposes an injury in fact on UIP because, to the extent it requires UIP and its health plan insurer to provide coverage for gender transition services, abortion, or infertility treatments such as IVF, surrogacy, or gamete donation, it would violate UIP's Christian values, giving scandal to its employees and supporters, and otherwise compromise its religious mission.

148.    UIP does not accommodate employees to engage in the violation of the moral teachings of the Christian faith, including respect for human life.

149.    The PWFA Rule, the AGT Mandate, and the Harassment Guidance are causing injury in fact to UIP, because the PWFA Rule, the AGT Mandate, and the Harassment Guidance require workplace accommodation for employees to obtain an abortion, an immoral infertility treatment, or transgender affirmation.

150.    UIP will not use false pronouns or provide access to single sex spaces by those of the opposite sex.

151.    UIP will take appropriate adverse employment action against any employee who encourages another person to obtain an abortion, immoral infertility treatment, or transgender affirmation.

152.    UIP will take appropriate adverse employment action against any employee whose speech, advocacy, or conduct undermines Christian teachings about abortion, immoral infertility treatment, or transgender affirmation through use of false pronouns or improper access to single sex spaces.

153.    UIP's purpose is "to redirect America toward Christ and Godly wisdom by mobilizing, unifying, and directing a powerful movement that alters the trajectory of the nation

away from self-destruction to the commanding heights of each of the seven cultural mountains." Ex. C, Bylaws, art. 2.1.

### 3.    UIP has associational standing to sue on behalf of its employer members

154.    One of UIP's specific purposes is to "[s]upport [its] employer members that, as part of their Christian witness and exercise, provide health or other benefits to their respective employees in a manner consistent with Christian values; and advocate for their religious freedom and other constitutional rights so they might conduct their work and business according to Christian values." *Id.*, art. 2.1.8.

155.    Thus, one of UIP's foundational purposes is to protect the freedom of its employer members so they might conduct their businesses and ministries and do their work consistently with Christian values. This includes the UIP employer members' freedom to design and implement employment policies and practices, to provide employee health plans, and to speak, write, preach, and teach with regard to subjects like sex, marriage, abortion, infertility treatment, and gender transition.

156.    UIP has two classes of members, individuals known as Ziklag members and employer members owned or led by Ziklag members and other Christians. *Id.*, art. VII. "A Ziklag member must be Christian, a successful entrepreneur or business leader, and a supporter of [UIP]." Ex. D UIP Second Amended and Restated Certificate of Formation, art. VI.

157.    UIP's employer members must satisfy these qualifications:

7.2.1.1.    An employer member must be either over 50% owned by Christians at least one of whom is a Ziklag member or has a governing body comprised of over 50% Christians at least one of whom is a Ziklag member.

7.2.1.2.  The employer member must . . . commit to provide in its employee health plan coverage consistent with Christian values.

7.2.1.3.  "Consistent with Christian values" means excluding services for, healthcare coverage of, reimbursement for, or access to (1) abortion, (2) abortion-inducing drugs and devices, (3) treatments derived from human embryonic stem cells or fetal tissue acquired from acquired from destruction of a fertilized ovum or from abortion, (4) assisted suicide, (5) gender transition services including without limitation puberty blockers, cross-sex hormones, gender reassignment surgeries, and gender conforming surgeries, and (6) counseling affirming or encouraging any such acts--unless the employer has exhausted all alternatives that do not bring about a greater evil, the employer opposes the act, and the employer has taken reasonable steps to avoid compromising its Biblical witness. "Christian values" may also mean exploring what additional coverages to provide to employees because of Jesus' example and teaching. Possibilities, among others, include coverage for ethical infertility treatments, assistance with adoption expense, and grants of extra paternity or bereavement leave.

Ex. C.  UIP Bylaws, art. 7.2.1.

158.  Each of UIP's directors:

. . . must be at least 18 years old, baptized, a professing Christian, a member of a Christian church, and a Ziklag member. Each must affirm the Ministry's Statements of Faith and Beliefs, . . . ." No Director shall be living in: a common-law state of matrimony; or a manner inconsistent with the Ministry's beliefs on marriage or sexuality. Directors shall not engage in communications or other conduct that would give rise to scandal or otherwise discredit the Ministry.

*Id.*, art. 4.4.

159.  Each of UIP's board officers and staff officers must meet these same qualifications.

*Id.*, arts. 4.4, 5.1, 6.2.

160.  All of the UIP's directors, officers, employees, and members are Christian.

161.  UIP employer members include sixty-five businesses and nonprofits. UIP's nonprofit employer members include, among others, a Christian college, a Christian high school, and a Christian church.

162.   Attached here as Exhibit E is the declaration of Michael Seifert, the Chief Executive Officer of PublicSquare. PublicSquare is a UIP employer member. It has 120 employees and is thus subject to the AGT Mandate, the PWFA Rule, and the Harassment Guidance. Ex. C, ¶ 10. It has a health plan provided by a third-party administrator that is a covered entity under the 2024 Rule. Ex. E, ¶ 25. It adheres to Christian values described by Dr. Strachan, and will not operate its business as required by the AGT Mandate, the PWFA Rule, or the Harassment Guidance. Ex. E, ¶ 24. PublicSquare, therefore, has standing to sue in its own right. Michael Seifert's declaration is incorporated by reference.

163.   UIP seeks to protect their members' ability to operate in accordance with Christian values and to access morally compliant health coverage for their respective employees. It additionally seeks, for members that are covered entities, protection from being required to cover medical services, drugs, or surgeries that are contrary to Christian values.

164.   UIP can adequately represent its members' interests. UIP members are similarly situated in that the HHS's and EEOC's respective interpretations of Section Title VII coerces UIP members to cover, pay for, accommodate, or otherwise directly or indirectly facilitate access to gender transition services, abortions, and immoral infertility treatments for their patients or for their employees in violation of UIP members' sincerely held Christian beliefs. The Mandate also deprives (or will deprive) certain UIP members of the option to purchase group insurance or to arrange self-funded plans without gender transition, abortion, and immoral infertility coverage.

165.   Most UIP employer members provide employee health benefits by contracting with health insurers and TPAs. These insurers and TPAs participate in federally funded marketplaces and thus are covered entities under HHS's 2024 Rule.

166. Most UIP employer members have fifteen or more employees and, thus, are "employers" within the meaning of PWFA, 42 U.S.C. § 2000gg(2), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

167. HHS's 2024 Rule, the PWFA Rule, and the Harassment Guidance constrain and burden UIP employer members' ability to inform their employees of their Christian values, to direct them consistently with those values, and to speak and act consistently with their sincere Christian beliefs to the extent that they require use of false pronouns, abstaining from communications contrary to gender ideology, granting access to bathrooms and other single sex spaces by those of the opposite sex, and accommodating women employees seeking abortion or IVF.

168. HHS's 2024 Rule implementing Section 1557 of the Affordable Care Act, the Pregnant Workers Fairness Act, its implementing Rule, Title VII, and EEOC's Harassment Guidance interpreting Title VII constrain and burden UIP's foundational purpose of protecting the freedom of its employer members so they might conduct their businesses and ministries and do their work consistently with Christian values.

### B.    DEFENDANTS

169. Defendants are appointed officials of the federal government and federal government agencies responsible for promulgating, administering, and enforcing the Mandate.

170. Defendant United States Department of Health and Human Services is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the 2016, 2020, and 2024 Rules.

171. Defendant Xavier Becerra is the Secretary of HHS. He is sued only in his official capacity.

172.   Defendant Equal Employment Opportunity Commission is a federal agency that administers, interprets, and enforces certain laws, including Title VII. The EEOC is responsible for, among other things, investigating complaints and bringing enforcement actions against employers for discrimination "because of . . . sex" in violation of Title VII.

173.   Defendant Charlotte Burrows is the EEOC Chair. She is, in this capacity, responsible for the administration and implementation of policy within the EEOC, including investigation and enforcement pursuant to Title VII. She is sued only in her official capacity.

## V. THE IMMORAL FEDERAL MANDATES BURDEN PLAINTIFFS' RELIGIOUS EXERCISE.

174.   The AGT Mandate's regulatory scheme makes it virtually impossible for Plaintiffs to conduct their ministries and business consistent with their Christian values. The Mandate injures Plaintiffs and burdens their religious exercise by foreclosing their ability to acquire a group health plan that reflects Christian values. This is because group insurers, TPAs, PBMs, and other service providers are covered entities that are required, under the 2024 Rule, to cover gender transition, abortion, and/or immoral infertility treatments regardless of whether an employee health plan excludes such coverages. Plaintiffs that sponsor insured group plans or self-funded plans have only two options: (1) violate their Christian values by providing an employee health plan that includes coverage for gender transition, abortion, and/or immoral infertility treatments; or (2) violate their Christian values and, if they have fifty or more employees, also violate the Affordable Care Act's employer mandate, by terminating their employee health plan, *see* 26 U.S.C. §§ 4980H(a)(1), 5000A(f)(2), (3). Absent declaratory and injunctive relief from the Court, these options are ruinous to Plaintiffs.

175.   Absent relief from this Court, Plaintiffs with fifteen or more employees are threatened by the EEOC's interpretation of the PWFA and Title VII resulting in the PWFA Rule and the Harassment Guidance directing Plaintiffs to support by word and deed and to become complicit with their respective employees' choices to seek or engage in abortion, immoral infertility treatment, and gender transition in violation of their Christian convictions.

176.   The PWFA Rule burdens Plaintiffs' Christian values and religious exercise by requiring them to accommodate employee efforts to engage in abortion and immoral infertility treatments.

177.   The Harassment Guideline burdens Plaintiffs' Christian values and religious exercise by requiring them to use false pronouns when requested by their employees.

178.   The PWFA Rule's anti-retaliation and anti-coercion provisions and the Harassment Guideline burdens Plaintiffs' Christian values and religious exercise by imposing Speech Codes that effectively bar them from teaching, preaching, and speaking, and from adopting and applying policies consistent with Christian values related to marriage, human life, abortion, infertility, sexuality, and privacy.

179.   The PWFA Rule requires Plaintiffs to change their speech, and/or be silent, to support abortion and immoral infertility treatment. It does so, for example, by requiring Plaintiffs to withdraw their policies and practices against (i) abortion accommodations or advocacy and (ii) immoral infertility treatment, and replace them with policies and procedures that affirm a willingness to accommodate abortion and infertility treatments, prohibit any potentially "harassing" discussion of abortion or infertility treatments in the workplace, including many potential discussions regarding the moral and religious implications of abortion, and to not

49

"interfere with" "any individual" in the exercise of abortion- or infertility-related rights created by the PWFA Rule.

180.   Similarly, the Harassment Guidance forces Plaintiffs to change their speech as to sex and gender. For example, they must adopt policies that allow employees to identify themselves as a sex different than their biology and force the employer to use language congruent with the employee's "chosen" sex. Under the Harassment Guidance, Plaintiffs must affirmatively sanction falsehoods related to sex and gender that are directly contrary to Christian belief and teaching.

181.   The Harassment Guidance burdens Plaintiffs' Christian values and religious exercise by requiring them to grant access to employees of one sex to bathrooms, locker rooms, and other spaces reserved to those of the opposite sex.

182.   If Plaintiffs do not take immediate steps to comply with the PWFA Rule and the Harassment Guidance, they will be under threat of administration investigations, civil lawsuits, and various penalties if they continue to act a manner consistent with their Christian convictions

183.   Absent relief from this Court, Plaintiffs are currently threatened by the PWFA Rule and Harassment Guidance with administrative investigations, civil lawsuits, and various penalties if they continue to act in manner that reflects their Christian convictions.

## VI. CAUSES OF ACTION

### Claim 1: The Religious Freedom Restoration Act does not require Plaintiffs to cover or provide gender-transition services; accommodate employee abortions or immoral infertility treatments; use false pronouns; or allow access to single-sex spaces by members of the opposite sex.

184.   The Religious Freedom Restoration Act ("RFRA") prohibits the federal government from substantially burdening the exercise of religion. 42 U.S.C. § 2000bb-1. The only exception is when the federal government demonstrates that the application of the burden to the affected

individual represents the "least restrictive means" of advancing "a compelling governmental interest." 42 U.S.C. § 2000bb-1(b); *DeOtte v. Azar*, 332 F.R.D. 173, 188 (N.D. Tex. 2019).

185.   Title VII and Section 1557, as interpreted by the AGT Mandate, the PWFA Rule, and the Harassment Guidance, substantially burden Plaintiffs' religious freedom by preventing them from operating their places of employment in accordance with Christian teaching.

186.   There is no compelling governmental interest in forcing objecting religious employers to comply with Defendants' interpretations of Section 1557 and Title VII, which is evident from the fact that Congress has specifically exempted these employers by way of Title VII's and Title IX's religious exemptions.

**Claim 2: The Free Exercise Clause compels exemptions to HHS's interpretation of Section 1557.**

187.   Section 1557, as interpreted by HHS in the 2024 Rule, violates the Free Exercise Clause by failing to exempt religious employers from its prohibition on sex.

188.   Section 1557 is not a "neutral" law of "general applicability" because it exempts some religious employers from its prohibition on religious discrimination but not others. 42 U.S.C. § 18116(a). Section 1557 and the 2024 Rule also exempt certain entities described above. Accordingly, Plaintiffs' Free Exercise claims should be analyzed under the strict scrutiny of *Sherbert v. Verner*, 374 U.S. 398 (1963).

189.   For the reasons previously stated, there is no compelling governmental interest accomplished by the least restrictive means for HHS's interpretation of Section 1557.

**Claim 3: The Free Exercise Clause compels exemptions to EEOC's interpretation of Title VII.**

190. Title VII, as interpreted by EEOC in the Harassment Guidance and the AGT Mandate, violates the Free Exercise Clause by failing to exempt religious employers from its prohibition on sex.

191. Title VII is not a law of "general applicability" because it exempts religious employers from its prohibition on religious discrimination. *See* 42 U.S.C. § 2000e- 1(a) ("This subchapter shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities."). Title VII also exempts employers with fewer than 15 employees. *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), is therefore inapplicable, and the plaintiffs' Free Exercise claims should be analyzed under the strict scrutiny of *Sherbert v. Verner*, 374 U.S. 398 (1963).

192. If *Smith* forecloses the Plaintiffs' free-exercise claims, then *Smith* should be overruled.

193. For the reasons previously stated, there is no compelling governmental interest accomplished by the least restrictive means for EEOC's interpretation of Title VII.

**Claim 4: The Free Exercise Clause compels exemptions to EEOC's interpretation of the PWFA.**

194. The PWFA, as interpreted by EEOC in the PWFA Rule, violates the Free Exercise Clause by failing to exempt religious employers from its prohibition on sex.

195.  The PWFA is not a law of "general applicability" because it exempts religious employers from its prohibition on religious discrimination. *See* 42 U.S.C. § 2000gg-5(b) (incorporating 42 U.S.C. § 2000e-1(a) by reference). The PWFA also exempts employers with fewer than 15 employees. Plaintiffs' claims, therefore, should be analyzed under strict scrutiny.

196.  For the reasons previously stated, there is no compelling governmental interest accomplished by the least restrictive means for EEOC's interpretation of the PWFA.

**Claim 5: The First Amendment Right of expressive association compels exemptions to EEOC's interpretation of Title VII.**

197.  Title VII and the PWFA, as interpreted by the EEOC in the AGT Mandate, the PWFA rule, and the Harassment Guidance, violates the First Amendment right of expressive association by failing to exempt employers who oppose abortion, immoral infertility treatments, and homosexual or transgender behavior. *See Boy Scouts v. Dale*, 530 U.S. 640 (2000).

**Claim 6: The First Amendment Right to freedom of speech compels exemptions to EEOC's interpretation of Title VII and the PWFA, and HHS's interpretation of Section 1557.**

198.  The AGT Mandate, the PWFA Rule, and the Harassment Guidance require Plaintiffs to alter their speech on transgenderism, abortion, and immoral infertility treatments.

199.  The AGT Mandate, the PWFA Rule, and the Harassment Guidance, therefore, violate Plaintiffs' rights to be free from compelled speech and/or compelled silence.

200.  For the reasons stated above, the AGT Mandate, the PWFA Rule, and the Harassment Guidance do not serve a compelling governmental interest achieved by narrowly tailored means.

**Claim 7: The 2024 Rule and the PWFA Rule violate the Administrative Procedure Act because they are not in accordance with law; were issued in excess of statutory authority; and are arbitrary and capricious.**

201.  Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the 2024 Rule, along with the PWFA Rule complained of herein, constitute "rules" under the APA, *id.* § 551(4), and constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court," *id.* § 704. The 2024 Rule and the PWFA Rule are each a "rule" under the APA. 5 U.S.C. § 551. The 2024 Rule and the PWFA Rule are each a "final agency action" subject to judicial review. 5 U.S.C. § 704.

202.  The APA prohibits agency actions that are "not in accordance with law, in excess of statutory authority, or limitation, or short of statutory right." *Id.* § 706(2)(A), (C). The APA also prohibits agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. §706(2)(A).

203.  The 2024 Rule and the PWFA Rule are not in accordance with law and arbitrary for a number of independent reasons.

204.  HHS's failure to include in the 2024 Rule a religious exemption and abortion neutrality provisions that parallels the religious exemption and abortion neutrality provisions in Title IX is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A). HHS's failure to include an exclusion for gender identity and/or transgender status from the 2024 Rule—as required by 42 U.S.C. § 18116(a) and 29 U.S.C. § 705(20)(F)(i)—is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A). The 2024 Rule violates the Church Amendments, 42 U.S.C. § 300a-7, which protect the right of healthcare entities that receive federal funding to

refuse to participate, perform, or assist with gender-transition procedures, including when it would be contrary to his religious beliefs or moral convictions.

205. Further, Congress must "speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2022) (cleaned up). Section 1557 does not clearly authorize the 2024 Rule.

206. The PWFA Rule also requires employers to accommodate abortion and immoral infertility treatments. It is not in accordance with the PWFA, which does apply to abortion or immoral infertility treatments. EEOC's failure to include in the PWFA Rule a religious exemption protecting Christian employers for acting consistent with religious beliefs that parallels the religious exemption in Title VII is thus not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A). EEOC's decision to interpret the PWFA to require accommodation for abortion and immoral infertility treatment is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

207. Title VII and the PWFA interpretations offered by the EEOC in the AGT Mandate, the PWFA rule, and the Harassment Guidance, violate the First Amendment right of expressive association by failing to exempt employers who oppose abortion, immoral infertility treatments, and homosexual or transgender behavior. *See Boy Scouts v. Dale*, 530 U.S. 640 (2000).

## VII.    PRAYER FOR RELIEF

Plaintiffs request that the Court:

    A. Declare Section 1557 and any rules implementing it do not require Plaintiffs to provide insurance or self-funded plan coverage for gender transition services,[8] chemical and

---

[8] "Gender transition services" includes puberty blockers, cross-sex hormones, other pharmaceuticals, "top" and "bottom" surgeries, gender-conforming cosmetic surgeries, voice

surgical abortion, or artificial reproductive technologies[9] because mandating such coverage violates Plaintiffs' sincerely held religious beliefs without satisfying strict scrutiny under the RFRA;

B.  Declare that Title VII and any rules or guidance implementing it do not require the Plaintiffs to provide insurance or self-funded plan coverage for gender-transition services, surgical or chemical abortion, or artificial reproductive technologies because mandating such coverage violates Plaintiffs' sincerely held religious beliefs without satisfying strict scrutiny under the RFRA and without complying with Title VII's religious exemption that protects employers' religious practices, 42 U.S.C. § 2000e-1(a) and 42 U.S.C. § 2000e(j);

C.  Declare that the Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg-1, et seq., and any rule implementing it (including Implementation of the Pregnant Workers Fairness Act, 89 Fed. Reg. 29,096 (April 19, 2024) do not require Plaintiffs to accommodate an employee's chemical or surgical abortion, advocacy for abortion, facilitation of an abortion; or an employee's artificial reproductive technology, advocacy for artificial reproductive technology, or  facilitation of artificial reproductive technology.

D.  Declare that the PWFA, the PWFA Rule, Title VII of the Civil Rights Act of 1964 (as amended, 42 U.S.C. § 2000e et seq., the Enforcement Guidance on Harassment in the Workplace (April 29, 2024), https://www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-workplace ("Harassment Guidance"), and any rule or interpretation

---

reconstruction, "affirming" care, related counseling, and other treatments in furtherance of a gender transition.

[9] "Artificial reproductive technologies as used in this Complaint means all infertility treatments that violate Christian beliefs, including without limitation in vitro fertilization ("IVF"), surrogacy, and gamete donation.

implementing these statutes do not require Plaintiffs: to speak or communicate in favor of the chemical or surgical abortion, artificial reproductive technology, or gender transition; to refrain from speaking or communicating against the same when such is contrary to their Christian faith; to use pronouns inconsistent with a person's biological sex; or to allow persons to use bathrooms or other private spaces reserved for the opposite sex because this Court finds that such an application of these laws violate Plaintiffs' sincerely held religious beliefs without satisfying strict scrutiny under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq. and without complying with Title VII's religious exemption that protects employers' religious practices, 42 U.S.C. § 2000e-1(a) and 42 U.S.C. § 2000e(j);

E.  Declare that the PWFA and the PWFA Rule and any subsequent rules applying the PWFA against Plaintiffs violate the Administrative Procedure Act, and that no legal burdens can be assessed against Plaintiffs for failure to accommodate chemical or surgical abortion or artificial reproductive technology;

F.  Declare that the PWFA Rule and Defendants' enforcement of it against Plaintiffs violate the laws and constitutional provisions described in their causes of action to the extent that the PWFA Rule requires Plaintiffs to accommodate chemical or surgical abortion or artificial reproductive technology;

G.  Issue a temporary restraining order, preliminary injunction, and permanent injunction prohibiting:

   i.   The Department of Health and Human Services, Secretary Becerra, their divisions, bureaus, agents, officers, commissioners, employees, and anyone acting in concert or participation with them, including their successors in office, from interpreting or

enforcing Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116(a), or any implementing regulations thereto against the Plaintiffs in a manner that would require them to provide insurance or self-funded plan coverage for gender-transition procedures, chemical or surgical abortion, or infertility treatments including by denying federal financial assistance or by otherwise pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement action; and

ii.   The Equal Employment Opportunity Commission, Chair Burrows, their divisions, bureaus, agents, officers, commissioners, employees, and anyone acting in concert or participation with them, including their successors in office, from interpreting or enforcing Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., or any implementing regulations thereto against the Plaintiffs in a manner that would require them to provide insurance or self-funded plan coverage for gender-transition procedures or artificial reproductive technology; from otherwise pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions because Plaintiffs excluded or denied such coverages; from initiating any investigation into claims that Plaintiffs have violated Title VII or any implementing regulations thereto because Plaintiffs excluded or denied such coverages; and from issuing any notice of right-to-sue because Plaintiffs excluded or denied such coverages.

iii.  The Equal Employment Opportunity Commission, Chair Burrows, their divisions, bureaus, agents, officers, commissioners, employees, and anyone acting in concert

or participation with them, including their successors in office, from interpreting or enforcing the PWFA, 42 U.S.C. § 2000gg-1, et. seq., or any implementing regulations thereto against the Plaintiffs in a manner that would require them to accommodate chemical or surgical abortion or artificial reproductive technology, speak in favor of the same or refrain from speaking against the same; from otherwise pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions because Plaintiffs refused such accommodations, or engaged or abstained from such communications; from initiating any investigation into claims or charges that Plaintiffs violated the PWFA or any implementing regulations thereto by denying such accommodations or by engaging or abstaining from such communications; and from issuing any notice of right-to-sue because of the same.

iv.    The Equal Employment Opportunity Commission, Chair Burrows, their divisions, bureaus, agents, officers, commissioners, employees, and anyone acting in concert or participation with them, including their successors in office, from interpreting or enforcing Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., or any implementing regulations thereto against the Plaintiffs in a manner that would require them to speak or communicate in favor of the chemical or surgical abortion, immoral infertility treatments, or gender transition when such is contrary to Plaintiffs' religious beliefs; refrain from speaking or communicating against the same when such is contrary to Plaintiffs' religious beliefs; use pronouns inconsistent with a person's biological sex; or allow persons to use private spaces

reserved for the opposite sex; from pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions because of such conduct; from initiating any investigation into claims or charges that Plaintiffs violated the PWFA or any implementing regulations thereto because of such conduct; and from issuing any notice of right-to-sue letter because of the same.

H. Vacate the PWFA Rule as it includes chemical or surgical abortion, immortal infertility treatment, or speech about the same.

I. Extend the relief provided in this lawsuit to: Plaintiffs; anyone acting in concert or participation with them; and their respective health plans any insurers, third-party administrators ("TPA"), pharmacy benefit managers ("PBM"), or other service providers in connection with such health plans.

J. Declare that to come within the scope of this order, a present or future UIP employer member must meet the following criteria: (a) The employer is not yet protected by any other judicial order from the statutes, regulations, guidances, or interpretations at issue in this case; (b) UIP has determined that the employer meets the UIP's employer membership criteria; (c) UIP's membership criteria have not materially changed since Plaintiffs filed this complaint; (d) the employer is not subject to an adverse ruling on the merits in another case involving the statutes, regulations, guidances, or interpretations at issue in this case; and (e) the employer must have been an UIP employer member at the time of the alleged violation .

K. Declare that the 2024 Rule and the PWFA Rule, and Defendants' enforcement of them against Plaintiffs, violates the Administrative Procedure Act, and that no taxes, penalties,

or other burdens can be charged or assessed against Plaintiffs for failure to pay for, cover, or accommodate (by word or deed) chemical or surgical abortion, artificial reproductive technology contrary to Plaintiffs' religious beliefs, or gender transition services;

L.  Declare that the statutes, regulations, interpretations, and guidances at issue in this case, and Defendants' enforcement of them against Plaintiffs, violate the laws and constitutional provisions described in their causes of action, and that no taxes, penalties, or other burdens can be charged or assessed against the Plaintiffs for failure to pay for, cover, or accommodate (by word or deed) chemical or surgical abortion, artificial reproductive technology, or gender transition services contrary to Plaintiffs' religious beliefs;

M.  Declare that any interpretation of Title VII and Section 1557 or related regulation or guidance to require coverage of gender-transition services; chemical or surgical abortion; and artificial reproductive technologies that violate Plaintiffs' religious beliefs may not be applied against the Plaintiffs, their insurers, TPAs, PBMs, or other service providers; may not interfere with Plaintiffs' attempts to arrange or contract for morally compliant health coverage or related services for their employees; and that no taxes, penalties, or other burdens can be charged or assessed against such insurers, TPAs, PBMs, or other service providers in relation to their work for Plaintiffs;

N.  Declare that Plaintiffs have the right to contract with service providers, including insurers, TPAs, PBMs, and other service providers to secure morally compliant health plans;

O.  Award nominal damages;

P.  Award Plaintiffs the costs of this action and reasonable attorney's fees as provided by law,

including 28 U.S.C. § 2412(d) and 42 U.S.C. § 1988(b); and

Q.  Award such further relief as the Court deems equitable and just.

October 15, 2024                                    Respectfully submitted.

*/s/ John C. Sullivan*
John C. Sullivan
Texas Bar No. 24083920
*john.sullivan@the-sl-lawfirm.com*
Jace R. Yarbrough
Texas Bar No. 24110560
*jace.yarbrough@the-sl-lawfirm.com*
S|L LAW PLLC
610 Uptown Blvd., Suite 2000
Cedar Hill, TX 75104
T: (469) 523-1351
F: (469) 613-0891

*/s/ Andrew Nussbaum*
L. Martin Nussbaum*
*martin@first-fourteenth.com*
Andrew Nussbaum
*andrew@first-fourteenth.com*
FIRST & FOURTEENTH PLLC
2 N. Cascade Ave., Suite 1430
Colorado Springs, CO 80903
T: (719) 428-2386

**pro hac vice* application forthcoming

*Attorneys for Plaintiffs*

## VERIFICATION PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the foregoing allegations in paragraphs 81, 119-140, 174-183 are true and correct to the best of my knowledge.

Executed on October 15, 2024

_____
Joe Waresak
President, Dr. James Dobson Family Institute

63

## VERIFICATION PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the foregoing allegations in paragraphs 81, 141-169, 174-183 are true and correct to the best of my knowledge

Executed on October 15, 2024

_____
Drew Hiss
Executive Director, USATransForm dba United in Purpose