## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

DR. JAMES DOBSON FAMILY INSTI-
TUTE and USATRANSFORM d/b/a
UNITED IN PURPOSE,

       Plaintiffs,

v.

       Case No. 4:24-cv-00986-O

XAVIER BECERRA, Secretary of the
United States Department of Health and
Human Services; UNITED STATES
DEPARTMENT OF HEALTH AND HU-
MAN SERVICES; CHARLOTTE BUR-
ROWS, Chair of the United States Equal
Employment
Opportunity Commission; and UNITED
STATES EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

       Defendants.

---

## PLAINTIFFS' COMBINED MOTION FOR PRELIMINARY INJUNCTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

### November 11, 2024

---

**FIRST & FOURTEENTH PLLC**

L. Martin Nussbaum*
Andrew Nussbaum
2 N. Cascade Ave., Suite 1430
Colorado Springs, CO 80903
(719) 428-2386
martin@first-fourteenth.com
andrew@first-fourteenth.com

**S|L LAW PLLC**

John C. Sullivan
Jace R. Yarbrough
610 Uptown Blvd., Suite 2000
Cedar Hill, TX 75104
(469) 523-1351
john.sullivan@the-sl-lawfirm.com
jace.yarbrough@the-sl-lawfirm.com

  *application for admission pending*

## **Table of Contents**

SUMMARY ........................................................................................................................... 1
STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................................... 2
   1.    Plaintiffs and their members are Christian organizations that operate according to
       traditional Christian teaching on marriage, human sexuality, and the sanctity of life. ... 2
     1.1.   James Dobson Family Institute .......................................................................... 2
     1.2.   USATransform ................................................................................................. 5
LEGAL BACKGROUND ....................................................................................................... 9
   1.    The History of the Abortion and Gender-Transition Services Mandate ......................... 9
     1.1.   Statutory Provisions Used for the AGT Mandate .............................................. 9
     1.2.   The 2016 Section 1557 Rule and Subsequent Injunctions ................................ 10
     1.3.   The 2020 Rule and *Bostock* ............................................................................ 12
     1.4.   The 2021 and 2022 Notices ............................................................................. 14
     1.5.   The 2024 Rule .................................................................................................. 15
   2.    The EEOC AGT Mandate's governance of employer health plans .............................. 25
   3.    The Pregnant Worker Fairness Act and the PWFA Rule ............................................... 27
   4.    EEOC's Harassment Guidance ...................................................................................... 29
PROCEDURAL HISTORY .................................................................................................... 32
STANDARD OF REVIEW ..................................................................................................... 32
   1.    Preliminary and permanent injunction .......................................................................... 32
   2.    Summary judgment ........................................................................................................ 32
   3.    Declaratory judgment .................................................................................................... 33
ARGUMENT .......................................................................................................................... 33
   1.    This case is justiciable. .................................................................................................. 33
     1.1.   Plaintiffs face Article III injury ....................................................................... 33
     1.2.   Plaintiffs' claims are ripe for adjudication ....................................................... 36
     1.3.   UIP has associational standing to represent its members. ................................. 37
     1.4.   Traceability and redressability are present. ...................................................... 37
   2.    Plaintiffs will succeed on the merits. ............................................................................ 38
     2.1.   The AGT Mandate, the PWFA Rule, and Harassment Guidance each violate the
           Religious Freedom Restoration Act (Count 1). ................................................. 38
     2.2.   The AGT Mandate, the PWFA Rule, and Harassment Guidance each violate the
           Free Exercise Clause (counts 2-4). ................................................................... 44
     2.3.   The AGT Mandate, the PWFA Rule, and the Harassment Guidance each violate
           the Free Speech Clause (counts 5-6) ................................................................. 45
   3.    Plaintiffs will suffer irreparable harm absent an injunction. .......................................... 48
   4.    The balance of the equities and the public interest favor Plaintiffs. ............................... 48
   5.    Request for Relief .......................................................................................................... 50
CONCLUSION ....................................................................................................................... 50

## SUMMARY[1]

Plaintiffs, the Dr. James Dobson Institute ("JDFI") and USATransForm d/b/a United in Purpose for itself and its employer members ("UIP") challenge three recent regulatory actions of the Department of Health and Human Services and Equal Employment Opportunity Commission that, together, force Plaintiffs to violate their Christian beliefs regarding abortion, human sexuality, and human dignity. <u>First</u>, Plaintiffs challenge HHS's and EEOC's tandem interpretations of Section 1557 of the Affordable Care Act and Title VII of the Civil Rights Act to require covered entities and employers to cover in their health plans abortion and "gender-transition services." Plaintiffs refer to this interpretation of Section 1557 and Title VII the "AGT Mandate." <u>Second</u>, Plaintiffs challenge EEOC's recently issued rule interpreting the Pregnant Workers Fairness Act ("PWFA Rule"), requiring covered employers to accommodate employee abortions and immoral infertility "treatments." <u>Third</u>, Plaintiffs challenge EEOC's recently revised Harassment Guidance that requires employers to use false pronouns and allow access to single-sex spaces by employees of the opposite sex. These mandates and previous versions of them have been repeatedly enjoined by courts across the country because they violate the Religious Freedom Restoration Act and the Administrative Procedure Act.[2] Indeed, one court has described

---

[1] Pursuant to Local Civil Rule 56.3(b), the elements of Plaintiffs' claims are set forth later in this brief.

[2] *Cath. Benefits Ass'n v. Burrows*, 2024 WL 4315021 (D.N.D. Sept. 23, 2024) (enjoining the PWFA Rule and the Harassment Guidance under RFRA in favor of a religious association of Catholic employers); *Louisiana v. Equal Emp. Opportunity Comm'n*, 705 F. Supp. 3d 643, 664 (W.D. La. 2024) (enjoining the PWFA Rule in favor the United States Conference of Catholic Bishops, two Catholic dioceses, and a coalition of states led by Louisiana); *Tennessee v. Becerra*, 2024 WL 3283887 (S.D. Miss. July 3, 2024) (enjoining AGT Mandate in favor of a coalition of States); *Texas v. Becerra*, 2024 WL 4490621, at *2 (E.D. Tex. Aug. 30, 2024) (staying AGT Mandate nationwide); *Texas v. Garland*, 719 F. Supp. 3d 521, 599 (N.D. Tex. 2024) (enjoining the PWFA Rule in

Defendants' administrative onslaught as a "regulatory war on religion." *Catholic Benefits Association*, 2024 WL 4315021, at *1.

Defendants do not dispute Plaintiffs' sincerely held religious beliefs. Plaintiffs therefore file this combined motion for a preliminary injunction and partial summary judgment, and request the Court grant them relief pursuant to FRCP 57 and FRCP 65.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**1. Plaintiffs and their members are Christian organizations that operate according to traditional Christian teaching on marriage, human sexuality, and the sanctity of life.**

### 1.1. James Dobson Family Institute

Dr. James Dobson incorporated JCD Family Forum, now known as The Dr. James Dobson Family Institute ("JDFI"), as a nonprofit corporation and Christian ministry in 2009. JDFI promotes and teaches biblical principles that support marriage, family, children, parenting, religious freedom, and Christian evangelism. ECF No. 1, Plaintiffs' Verified Complaint, ¶¶ 119–20 ("Compl.").[3] It serves families with broadcasts, monthly newsletters, feature articles, videos, blogs, books, and other resources available on demand via its website, mobile apps, and various social media platforms. *Id.* ¶ 121. JDFI's core Christian beliefs are set forth in its Statement of

---

favor of Texas); *Neese v. Becerra*, 640 F. Supp. 3d 668, 668–70 (N.D. Tex. 2022) (enjoining HHS's interpretation of Section 1557 to require gender-affirming care); *Christian Emps. All. v. United States Equal Opportunity Comm'n*, 719 F. Supp. 3d 912 (D.N.D. 2024) (enjoining the AGT Mandate under RFRA in favor of an association of Christian employers); *Neese v. Becerra*, 640 F. Supp. 3d 668, 668–70 (N.D. Tex. 2022) (enjoining HHS' interpretation of Section 1557 to require gender-affirming care); *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1142 (D.N.D. 2021) ("*Religious Sisters I*") (enjoining the AGT Mandate under RFRA in favor of several religious organizations), *aff'd in relevant part, Religious Sisters of Mercy v. Becerra*, 55 F.4th 583 (8th Cir. 2022) ("*Religious Sisters II*"); *Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660, 696 (N.D. Tex. 2016) ("*Franciscan Alliance I*") (enjoining the 2016 Section 1557 Rule).

[3] Plaintiffs' complaint is verified by officers of JDFI and UIP. Compl. at 66–67.

Faith. *Id.* ¶ 122. Those beliefs include, among others, that the Bible is the inspired Word of God, the divinity of Jesus Christ and his vicarious and atoning death, the resurrection, and the spiritual unity of Christian believers. *Id.* ¶ 122 & Ex. B-1 (Sixth and Restated Bylaws ("JDFI Bylaws")), art. I. JDFI's purposes are, among others, "[t]o preserve and promote the institution of the family"; "[t]o preserve and promote the institution of marriage; "[t]o preserve and promote parenthood and sound parenting"; "[t]o educate husbands, wives, fathers, mothers, and children and to give them Christ-oriented counsel; "[t]o protect and promote the sanctity of human life"; "[t]o encourage righteousness in the culture"; and "[t]o introduce as many as possible to the Gospel of Jesus Christ." *Id.* ¶ 123 & Ex. B-2 (Certificate of Second Amendment and Restatement of Articles of Incorporation of the Dr. James Dobson Family Institute ("JDFI Articles")), art. II.

Every JDFI director satisfies the requirements for directors stated in JDFI's Bylaws. Each is a "baptized, professing Christian, and member of a Christian Church. Each . . . affirm[s] and support[s] the Ministry's purposes, the [JDFI] Mission Statement, the [JDFI] Covenant, and the [JDFI] Statement of Faith." *Id.* ¶ 124 & Ex. B-1 (JDFI Bylaws), art. 3.5. JDFI's Chairman, Vice-Chairman, President, Secretary, and Treasurer are also Christians and satisfy the same requirements as those for directors. *Id.* ¶ 125 & Ex. B-1 (JDFI Bylaws), art. 4.1. All JDFI employees are professing Christians. *Id.* ¶ 126. As part of JDFI's employment application, prospective employees must acknowledge that he or she has "read, understand[s], and agree[s] with all parts of the JDFI Statement of Faith and Mission Statement" and affirm that, "[i]f hired, I agree to uphold these beliefs in my personal, daily life and to help JDFI pursue its mission." *Id.* ¶ 126 & Ex. B-3 (JDFI Employment Application). JDFI's Employee Manual explains that "JDFI expressly reserves the right, as a religious corporation, to base its hiring practices on the religious affiliation,

Christian lifestyle, and conviction of its applicants that are consistent with its core values." *Id.* ¶ 127 & Ex. B-4 (JDFI Employee Manual) at 4–7, 11.

Because of its Biblically informed values, JDFI believes that it should provide its full-time employees with health care benefits. *Id.* ¶ 128. It also believes that its health care coverage cannot include surgical or chemical abortion, infertility treatments that destroy human life, or gender transition medications or surgeries. *Id.* ¶ 128. JDFI also cannot and will not knowingly assist or accommodate employees in acquiring such drugs or services, and it cannot and will not use the language of gender ideology—including false pronouns—because all of these things are contrary to JDFI's Christian values. *Id.* ¶ 128. In his declaration attached and incorporated in Plaintiffs' verified complaint as Exhibit B, Dr. Owen Strachan—JDFI's Director of Culture—explained in detail JDFI's biblically based values with regard to these subjects. *Id.* ¶ 129 & Exh. B.

JDFI has over thirty employees and is therefore an "employer" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b), and the Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg(2). *Id.* ¶ 130. JDFI maintains a partially self-insured group plan for its employees. JDFI has contracted with a stop-loss provider and a third-party administrator. *Id.* ¶ 131. Its TPA participates in a federal exchange and thus receives funding from HHS. Declaration of Joe Waresak attached to this motion as Exhibit A, ¶ 2. Approximately twenty-nine JDFI employees are enrolled in its health plan. Approximately fifty-eight dependents of those employees are covered. The plan thus covers approximately eighty-seven individuals. Compl. ¶ 132. Consistent with its religious commitments, JDFI's employee health plan excludes surgical and chemical abortion, drugs or devices that may destroy the life of an embryo (either before or after) implantation (including IUDs, "emergency contraception," Plan B, and Ella), and any form of

4

"gender-affirming care." *Id.* ¶ 133. The plan also excludes coverage for any counseling or referrals to promote or refer for abortion, immoral infertility treatment, or "gender-affirming" care. *Id.* ¶ 133. If JDFI, its employee health plan, its TPA, its pharmacy benefit manager ("PBM"), or its other health plan service providers were required to provide coverage for abortion, immoral infertility treatments (including IVF, gamete donation, or surrogacy), or gender transition services, it would violate JDFI's religious values, scandalize its employees and supporters, and otherwise compromise its religious mission. *Id.* ¶ 134. JDFI cannot and will not use the language of gender ideology, including false pronouns, and it cannot and will not allow those of the opposite sex to access its single sex bathrooms. *Id.* ¶ 128; Doc. 1-2, Ex. B, Dr. Strachan Decl. ¶¶ 27–28, 31–33.

Similarly, JDFI does not and will not provide any workplace accommodation for an employee to obtain an abortion, an immoral infertility treatment, or gender transition services. Compl. ¶ 136. JDFI will also take appropriate employment action against any applicant or employee who encourages another person to obtain an abortion, immoral infertility treatment, or transgender affirmation, or whose speech and advocacy on these topics undermines JDFI's witness. *Id.* ¶ 138.

### 1.2. USATransform

USATransform, doing business as United in Purpose ("UIP"), is a Texas nonprofit corporation and Christian ministry with its principal office in Southlake, Texas. *Id.* ¶ 141. UIP has fifteen or more employees and, therefore, is an "employer" within the meaning of PWFA, 42 U.S.C. § 2000gg(2), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b). *Id.* ¶ 142. UIP's core Christian beliefs are set forth in its Statement of Faith and Statement of Beliefs in the first article of its Fourth Amended and Restated Bylaws ("UIP Bylaws") attached as Ex. C to Plaintiffs' verified complaint. They include, among others, belief in the Bible as the inspired Word of God; belief in "one God, eternally existent in three persons;" belief in the divinity of Jesus

Christ, his vicarious and atoning death, and his resurrection and ascension; and belief in the spiritual unity of Christian believers. Compl. ¶ 143. UIP's Statement of Faith also includes its beliefs on human sexuality and human dignity:

> 1.1.9. We believe God's plan for human sexuality is to be expressed only within the context of marriage, that God created man and woman as unique biological persons made to complete each other. God instituted monogamous marriage between male and female as the foundation of the family and the basic structure of human society. For this reason, we believe that marriage is exclusively the union of one genetic male and one genetic female. Genesis 2:24; Matthew 19:5-6; Mark 10:6-9; Romans 1:26-27; 1 Corinthians 6:9.
>
> . . .
>
> 1.1.11. We believe that human life is sacred from conception to its natural end; and that we must have concern for the physical and spiritual needs of our fellowmen. Psalm 139:13; Isaiah 49:1; Jeremiah 1:5; Matthew 22:37-39; Romans 12:20-21; Galatians 6:10.
>
> . . .
>
> 1.2.2 Sexuality. We believe consistent with Biblical principles, sexuality and the divinely prescribed boundaries for the expression thereof is covered clearly in the Holy Scriptures, which limit sexual contact to the marital relationship. Homosexual acts, adultery, bestiality, and all forms of fornication are categorically condemned in the Holy Scriptures. See 1 Cor. 6:18; 1 Thes. 4:3; Rom. 1:26-27; Prov. 5:3-5, 8-13; 7:21-27; Gal. 5:19; Exodus 20:14; Deut. 5:18; Matt. 5:27; 19:18; Luke 18:20; Rom. 13:9; James 2:11; Lev. 20:10-21; 1 Cor. 10:8; 6:18; Jude 7. Furthermore, the Ministry believes that sexuality is assigned by God at birth, and the Holy Scripture does not permit an individual to alter his or her sexual identity physically or otherwise.

*Id.* ¶¶ 144–45; UIP Bylaws, arts. 1.1.9, 1.1.11, 1.2.2. UIP and its members affirm Dr. Owen Strachan's further explanation of biblical values related to the mandates at issue in this case. Compl. ¶ 146; Declaration of Michael Seifert, CEO of Public Square, attached as Exhibit E to Plaintiffs' Verified Complaint, ¶ 21 (affirming Dr. Strachan's declaration) ("Seifert Decl.").

To the extent any federal mandate requires UIP and its health insurer to cover gender transition services, abortion, or immoral infertility treatments such as IVF, surrogacy, or gamete donation, it

would violate UIP's Christian values, give scandal to its employees and supporters, and otherwise compromise its religious mission. Compl. ¶ 147; Seifert Decl. ¶¶ 24–27. UIP and its members do not accommodate employees to engage in the violation of the moral teachings of the Christian faith, including respect for human life. Compl. ¶ 148; Seifert Decl. ¶ 24. UIP and its members will not use false pronouns or provide access to single sex spaces by those of the opposite sex for their employees. Compl. ¶ 150; Seifert Decl. ¶ 24. UIP and its members will take appropriate adverse employment action against any employee who encourages another person to obtain an abortion, immoral infertility treatment, or transgender affirmation. Compl. ¶ 151; Seifert Decl. ¶ 24. UIP and its members will take appropriate employment action against any employee whose speech, advocacy, or conduct undermines Christian teachings about abortion, immoral infertility treatments, or transgender affirmation through use of false pronouns or improper access to single sex spaces. Compl. ¶ 152; Seifert Decl. ¶ 27.

One of UIP's specific purposes is to "[s]upport [its] employer members that, as part of their Christian witness and exercise, provide health or other benefits to their respective employees in a manner consistent with Christian values; and advocate for their religious freedom and other constitutional rights so they might conduct their work and business according to Christian values." Compl. ¶ 154; Ex. C, art. 2.1.8. Thus, one of UIP's foundational purposes is to protect the freedom of its employer members so they might conduct their businesses and ministries and do their work consistent with Christian values. This includes the UIP employer members' freedom to design and implement employment policies and practices, to provide employee health plans, and to speak, write, preach, and teach with regard to subjects such as sex, marriage, abortion, infertility treatment, and gender transition. Compl. ¶ 155. UIP has two classes of members, individuals

known as Ziklag members and employer members owned or led by Ziklag members along with other Christians. *Id.* ¶ 156; Ex. C, art. VII. "A Ziklag member must be Christian, a successful entrepreneur or business leader, and a supporter of [UIP]." Compl. ¶ 156; Ex. C UIP Second Amended and Restated Certificate of Formation, art. VI. UIP's employer members must satisfy these qualifications:

> 7.2.1.1.  An employer member must be either over 50% owned by Christians at least one of whom is a Ziklag member or has a governing body comprised of over 50% Christians at least one of whom is a Ziklag member.

> 7.2.1.2.  The employer member must . . . commit to provide in its employee health plan coverage consistent with Christian values.

> 7.2.1.3.  "Consistent with Christian values" means excluding services for, healthcare coverage of, reimbursement for, or access to (1) abortion, (2) abortion-inducing drugs and devices, (3) treatments derived from human embryonic stem cells or fetal tissue acquired from acquired from destruction of a fertilized ovum or from abortion, (4) assisted suicide, (5) gender transition services including without limitation puberty blockers, cross-sex hormones, gender reassignment surgeries, and gender conforming surgeries, and (6) counseling affirming or encouraging any such acts—unless the employer has exhausted all alternatives that do not bring about a greater evil, the employer opposes the act, and the employer has taken reasonable steps to avoid compromising its Biblical witness. "Christian values" may also mean exploring what additional coverages to provide to employees because of Jesus' example and teaching. Possibilities, among others, include coverage for ethical infertility treatments, assistance with adoption expense, and grants of extra paternity or bereavement leave.

Compl. ¶ 157; UIP Bylaws, art. 7.2.1. UIP employer members include sixty-five businesses and nonprofit organizations. UIP's nonprofit employer members include, among others, a Christian college, a Christian high school, and a Christian church. Compl. ¶ 161.

Attached to the Plaintiffs' Complaint as Exhibit E is the declaration of Michael Seifert, the Chief Executive Officer of PublicSquare. PublicSquare is a UIP employer member. *Id.* ¶ 162. It has 120 employees and is thus subject to the EEOC's interpretation of Title VII mandating gender-

transition-services coverage, the PWFA Rule, and the Harassment Guidance. *Id.* ¶ 162; Ex. C, ¶ 10. It has a health plan provided by a third-party administrator that is a covered entity under the 2024 Rule. Compl. ¶ 162; Seifert Decl. ¶ 25. Public Square adheres to Christian values described by Dr. Strachan, and will not operate its business as required by the AGT Mandate, the PWFA Rule, or the Harassment Guidance. Compl. ¶ 162, Seifert Decl. ¶ 24.

## LEGAL BACKGROUND

### 1.  The History of the Abortion and Gender-Transition Services Mandate

#### 1.1.  Statutory Provisions Used for the AGT Mandate

Section 1557 of the ACA, and Titles VII and IX of the Civil Rights Act are the sources of HHS's and EEOC's AGT Mandate. 42 U.S.C. § 18116 (ACA); 20 U.S.C. § 1681(a)(3) (Title IX); 42 U.S.C. § 2000e(b) (Title VII). Section 1557 of the ACA provides that a federally funded or administered health program or activity is prohibited from denying benefits to, or subjecting to discrimination, an individual "on [a] ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.).'" 42 U.S.C. § 18116(a). "Section 1557 adopts the enforcement mechanisms available under the incorporated statutes, including Title IX." *Id.* Section 1557 vests the Secretary of HHS with discretion to promulgate implementing regulations. 42 U.S.C. § 18116(c).

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "In short, the statute bars sex-based discrimination." *Religious Sisters II,* 55 F.4th at 588 (cleaned up) (quoting *Portz v. St. Cloud State Univ.*, 16 F.4th 577, 580 (8th Cir. 2021)). Title IX exempts from this prohibition "an educational institution which is controlled by a religious organization if the

application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3). Title IX similarly requires neutrality regarding abortion: "Nothing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 20 U.S.C. § 1688. Title IX "authoriz[es] federal administrative enforcement by terminating the federal funding of any noncomplying recipient, or 'by any other means authorized by law.'" *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 467 n.5 (1999) (citing 20 U.S.C. § 1682(1–2)). The Supreme Court "has [also] recognized an implied private right of action." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009).

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against an applicant or employee "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Title VII applies to employers "with 15 or more employees." 42 U.S.C. § 2000e(b). An employer who violates Title VII faces an administrative enforcement action or private suit for compensatory damages, punitive damages, injunctive relief, attorney's fees, and other relief. *See* 42 U.S.C. §§ 1981a(b), 2000e-5(g). The EEOC "is empowered . . . to prevent any person from engaging in any unlawful employment practice" under Title VII. *Id.* § 2000e-5(a).

### 1.2. The 2016 Section 1557 Rule and Subsequent Injunctions

In May 2016, HHS issued a final rule interpreting Section 1557 to require coverage and performance of gender-transition services and abortion. Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376, 31,376 (May 18, 2016) ("2016 Rule"). The 2016 Rule defined "[c]overed entity" as "[a]n entity that operates a health program or activity, any part of which receives federal financial assistance." *Id.* at 31,466. In turn, it defined "[h]ealth program or activity" as "the provision or administration of health-related services, health-related insurance

coverage, or other health-related coverage." *Id.* at 31,467. The 2016 Rule's impact was extraordinarily broad, affecting most of the healthcare industry. In the Rule, HHS "concluded . . . that almost all practicing physicians in the United States are reached by Section 1557 because they accept some form of Federal remuneration or reimbursement apart from Medicare Part B." *Id.* at 31,446. Pursuant to Title IX, the 2016 Rule prohibited sex discrimination. *Id.* at 31,469. But the 2016 Rule defined "[o]n the basis of sex" to "include . . . sex stereotyping and gender identity." *Id.* at 31,467. It also defined sex discrimination to include "termination of pregnancy." *Id.* at 31,387.[4] The 2016 Rule required covered entities to perform gender-transition services if they would do so in another context. *Id.* at 31,471. For example, a covered entity would be forced to perform a hysterectomy for a female identifying as a male if the entity would also perform a hysterectomy for a female with uterine cancer.

"While the 2016 Rule provided that the statutory exceptions applicable for discrimination based on race, color, national origin, age, and disability applied, it omitted Title IX's religious exemption." *Religious Sisters II*, 55 F.4th at 590 (internal citation omitted). The 2016 Rule instead took a case-by-case approach to determining religious exemptions. HHS explained that "application of RFRA is the proper means to evaluate any religious concerns about the application of Section 1557 requirements." 81 Fed. Reg. at 31,380. "To obtain an exception, in other words, a provider objecting on religious grounds needed to convince HHS that the regulation circumstantially violated the RFRA." *Religious Sisters II*, 55 F.4th at 591 (citations omitted).

---

[4]    The 2016 Rule omitted a definition of "termination of pregnancy," which has been interpreted to encompass abortion. *Franciscan Alliance I*, 227 F. Supp. 3d at 690–94.

After the 2016 Rule was promulgated, it was challenged in this Court, which entered "a nationwide [preliminary] injunction," prohibiting HHS from "enforcing the [2016] Rule's prohibition against discrimination on the basis of gender identity." *Franciscan Alliance I*, 227 F. Supp. 3d at 696. At the same time, two suits in the District of North Dakota were filed challenging 2016 Rule and EEOC's concomitant interpretation of Title VII. One case (16-cv-386) was filed by the Religious Sisters of Mercy, Sacred Heart Mercy Health Care Center, SMP Health System, and the University of Mary. *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1131 (D.N.D. 2021). The second case (16-cv-432) was filed by the Catholic Benefits Association, as well as three of its members: Diocese of Fargo, Catholic Charities North Dakota, and Catholic Medical Association. *Id.* at 1133. The cases were consolidated, and the Court stayed the Mandate while Defendants considered promulgating a new rule. *Id.* at 1127.

### 1.3. The 2020 Rule and *Bostock*

HHS subsequently promulgated the 2020 Rule. Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160 (June 19, 2020) (the "2020 Rule"). The 2020 Rule adopted Title IX's religious exemption and "repeal[ed] the 2016 Rule's definition of 'on the basis of sex,' but decline[d] to replace it with a new regulatory definition. Instead, the [2020] [R]ule revert[ed] to, and relie[d] upon, the plain meaning of the term in [Title IX]." *Id.* at 37,178 (citation omitted). The 2020 Rule noted that that the Supreme Court's forthcoming decision in what would later become *Bostock v. Clayton County*, 590 U.S. 644 (2020) was likely to affect enforcement of Section 1557 and Title VII. 85 Fed. Reg. at 37,168.

*Bostock* was decided soon after HHS finalized the 2020 Rule. The Court held that "[w]hen an employer fires an employee for being homosexual or transgender, it necessarily and intentionally discriminates against that individual in part because of sex" under Title VII. 590 U.S. at 665. The

Court interpreted Title VII's prohibition on "sex discrimination" to include gender identity and sexual orientation. *Id.* at 651. Although the Court "proceed[ed] on the assumption that 'sex' . . . refer[s] only to biological distinctions between male and female," *id.* at 655, it determined that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex," *id.* at 660. The Court emphasized, however, that it was not "prejudg[ing]" whether its "decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination." *Id.* at 681.

The Court also expressed "deep[ ] concern[ ] with preserving the promise of the free exercise of religion enshrined in our Constitution." *Id.* at 681. "But," the Court noted, "worries about how Title VII may intersect with religious liberties are nothing new." *Id.* at 681–82. In fact, Congress went "a step further . . . in . . . RFRA" by "prohibit[ing] the federal government from substantially burdening a person's exercise of religion unless it demonstrates that doing so both furthers a compelling governmental interest and represents the least restrictive means of furthering that interest." *Id.* at 682. "Because RFRA operates as a kind of super statute, displacing the normal operation of other federal laws," the Court explained, "it might supersede Title VII's commands in appropriate cases." *Id.*

*Bostock* triggered multiple lawsuits challenging the 2020 Rule. Two courts entered nationwide injunctions preventing much of the 2020 Rule from going into effect, effectively reinstating portions of the 2016 Rule (the [*Walker*] and *Whitman-Walker* opinions). *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 372 (5th Cir. 2022) ("*Franciscan Alliance II*") (citing *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 60 (D.D.C. 2020); *Walker v. Azar*, 480 F. Supp. 3d 417, 420 (E.D.N.Y. 2020)).

#### 1.4. The 2021 and 2022 Notices

In January 2021, President Biden issued an executive order asserting that "laws that prohibit sex discrimination . . . prohibit discrimination on the basis of gender identity or sexual orientation." Exec. Order No. 13,988, 86 Fed. Reg. 7023, 7023 (Jan. 20, 2021). On May 25, 2021, HHS published a document titled "Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972." 86 Fed. Reg. 27,984 (May 25, 2021). The May 2021 notice said that "consistent with the Supreme Court's decision in *Bostock* and Title IX," HHS would "interpret and enforce section 1557 of the Affordable Care Act prohibition on discrimination on the basis of sex to include: Discrimination on the basis of sexual orientation; and discrimination on the basis of gender identity." *Id.*

Shortly thereafter, a group of physicians challenged the notification on the grounds that it would force them to treat youth suffering from gender dysphoria in a manner that violated their clinical judgment and conscience. *Neese v. Becerra*, 640 F. Supp. 3d 668, 668–70 (N.D. Tex. 2022). The Notification was found to be "not in accordance with the law." *Id.* at 675. A declaratory judgment was entered stating that "Section 1557 of the ACA does not prohibit discrimination on account of sexual orientation and gender identity, and the interpretation of 'sex' discrimination that the Supreme Court of the United States adopted in [*Bostock*] is inapplicable to the prohibitions on 'sex' discrimination in Title IX of the Education Amendments of 1972 and in Section 1557 of the ACA." Final Judgment, *Neese*, 2:21-cv-163-Z (N.D. Tex. Nov. 22, 2022), ECF No. 71.

In March 2022, HHS published a document titled "Notice and Guidance on Gender Affirming Care, Civil Rights, and Patient Privacy," https://perma.cc/R76P-KJ2X ("2022 Notice"). The 2022 Notice asserted that HHS "unequivocally" takes the position that restricting gender-change interventions even "for minors . . . is dangerous." *Id.* HHS announced that its Office of Civil

Rights would consider bringing enforcement actions against medical providers who comply with state laws that "restrict" the use of these interventions for minors. *Id.* HHS also claimed that refusal to provide these interventions could be discriminating on the basis of disability. *Id.* The 2022 Notice was subsequently vacated, though. *Texas v. Equal Employment Opportunity Commission*, 633 F. Supp. 3d 824, 847 (N.D. Tex. 2022). Among other things, the Court held that the 2022 Notice misread *Bostock*, and did not adequately explain how—despite the specific exclusion of gender identity disorders from the definition of disability in the Rehabilitation Act (and hence in Section 1557, *see* 42 U.S.C. § 18116(a) (including "section 794 of title 29"))—failure to provide cross-sex hormones or surgeries to these individuals could be discriminating on the basis of a disability. *Id.* at 836–38.

### 1.5. The 2024 Rule

On May 6, 2024, HHS published a rule interpreting Section 1557, Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37,522 (May 6, 2024) (the "2024 Rule"). The 2024 Rule repeals the 2020 Rule and reinstates the commands of the 2016 Rule. *Id.*

#### 1.1.1. Covered entities under the 2024 Rule

The 2024 Rule defines "health program or activity" to cover virtually all healthcare providers and facilities, as well as health insurers, TPAs, PBMs, and other service providers in the United States. Health program or activity means: "(1) Any project, enterprise, venture, or undertaking to: (i) Provide or administer health-related services, health insurance coverage, or other health-related coverage; (ii) Provide assistance to persons in obtaining health-related services, health insurance coverage, or other health-related coverage . . . ." 89 Fed. Reg. at 37,694, *to be codified* at 45 C.F.R. § 92.4; *see also* 89 Fed. Reg. at 37,538 ("OCR agrees with commenters' assessment that the

Proposed Rule's approach to the inclusion of health insurance coverage and other health-related coverage in the definition of 'health program or activity' . . . .").

### 1.1.2.   Prohibited discrimination under the 2024 Rule

The 2024 Rule says that "[d]iscrimination on the basis of sex includes, but is not limited to, discrimination on the basis of: (i) Sex characteristics, including intersex traits; (ii) Pregnancy or related conditions; (iii) Sexual orientation; (iv) Gender identity; and (v) Sex stereotypes." 89 Fed. Reg. at 37,699, *to be codified* at 45 C.F.R. § 92.101(a)(2).

### 1.1.3.   Gender-affirming care under the 2024 Rule

Although the 2024 Rule does not provide a definition of these terms, HHS previously defined "gender identity" in the 2022 Notice of Proposed Rulemaking to encompass a plethora of sexual identities, including "transgender," "nonbinary," "gender nonconforming," "genderqueer," or "genderfluid." Notice of Proposed Rulemaking, Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47,824, 47,867 (Aug. 4, 2022) ("2022 NPRM"). And the 2022 NPRM defines the Rule's prohibition on "gender identity" discrimination to require coverage and performance of "gender affirming care." "'[G]ender-affirming care' refers to care for transgender individuals (including those who identify using other terms, for example, nonbinary or gender nonconforming) that may include, but is not necessarily limited to, counseling, hormone therapy, surgery, and other services designed to treat gender dysphoria or support gender affirmation or transition." 87 Fed. Reg. at 47,834 n.139. Guidance from HHS's Office of Population Affairs defines "gender affirming care" to include:

| Affirming Care | What is it? | When is it used? | Reversible or not |
|---|---|---|---|
| **Social Affirmation** | Adopting gender-affirming hairstyles, clothing, name, gender pronouns, and restrooms and other facilities | At any age or stage | Reversible |

| **Puberty Blockers** | Using certain types of hormones to pause pubertal development | During puberty | Reversible |
|---|---|---|---|
| **Hormone Therapy** | Testosterone hormones for those who were assigned female at birth / Estrogen hormones for those who were assigned male at birth | Early adolescence onward | Partially reversible |
| **Gender-Affirming Surgeries** | "Top" surgery—to create male-typical chest shape or enhance breasts "Bottom" surgery—surgery on genitals or reproductive organs Facial feminization or other procedures. | Typically used in adulthood or case-by-case in adolescence | Not reversible |

HHS Office of Population Affairs, Gender-Affirming Care and Young People, https://bit.ly/3SzfVq3 (last visited Nov. 6, 2024).

Notably, this definition of sex is contrary to law. The 2024 Rule presupposes that Title IX, and by extension Section 1557, prohibits any discrimination based on "gender identity." 89 Fed. Reg. at 37,699, *to be codified at* 45 C.F.R. § 92.101(a)(2). But that premise is inconsistent with both *Neese v. Becerra*, 640 F. Supp. 3d 668, 684 (N.D. Tex. 2022) (holding Title IX does not prohibit gender-identity discrimination), and *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 813–14 (11th Cir. 2022) (holding Title IX's prohibition on sex discrimination does not prohibit discrimination on the basis of gender identity). *Id.* at 811. The Eleventh Circuit began by explaining that "sex" in Title IX means "biological sex," and not "gender identity." *Id. at* 812–13. Similarly, in *Florida v. HHS*, No. 24-cv-01080, ECF No. 41 (July 3, 2024 M.D. Fla.), the court preliminarily enjoined the 2024 partly on the ground that Title IX does not prohibit "gender identity" discrimination. *Id.* at 20.

### 1.1.4.   Abortion under the 2024 Rule

The 2024 Rule defines "[p]regnancy or related conditions" to include "termination of pregnancy," *i.e.* abortion. 89 Fed. Reg. at 37,576.[5] The Fifth Circuit has previously explained that defining sex discrimination to include "termination of pregnancy" "require[s] that hospitals perform . . . abortions." *Franciscan Alliance II*, 47 F.4th at 374. This, too, is contrary to law. Title IX states that it "shall not apply" to religious organizations, 20 U.S.C. § 1681(a)(3), and "shall [not] be construed to require . . . any person . . . to provide or pay for any benefit or service . . . related to an abortion," *id.* § 1688. As *Franciscan Alliance I* explained, "failure to incorporate Title IX's religious and abortion exemptions nullifies Congress's specific direction to prohibit only the ground proscribed by Title IX. That is not permitted." 227 F. Supp. 3d at 690–91. "By not including these exemptions, HHS expanded the 'ground prohibited under' Title IX that Section 1557 explicitly incorporated." *Id.* (citations omitted).

### 1.1.5. Immoral infertility treatments under the 2024 Rule

The 2024 Rule also defines sex discrimination and sexual-orientation discrimination to require providing and covering "fertility care," including procedures like IVF, surrogacy, and gamete donation. 89 Fed. Reg. at 37,577 (defining "fertility care" to include "IVF"). The Rule also requires covered entities to provide infertility treatments to non-married couples. *Id.* (stating that

---

[5] *See also* 89 Fed. Reg. at 37,576 ("A covered entity that chooses to provide abortion care but refuses to provide an abortion for a particular individual on the basis of a protected ground—such as race—would violate section 1557."); *id.* at 37,556 ("We clarify that a Nondiscrimination Policy's prohibition of sex discrimination encompasses protections afforded for various types of sex discrimination such as pregnancy, including termination of pregnancy or related conditions . . . ."); *id.* at 37,576 ("OCR has concluded as a matter of statutory interpretation that section 1557 does not require the Department to incorporate the language of title IX's abortion neutrality provision."); *id.* at 37,577 ("We note also that, as commenters suggested, this provision protects patients from discrimination on the basis of actual or perceived prior abortions."); *id.* at 37,606 ("To the extent plans offer coverage for termination of pregnancies and related services, they must do so on a non-discriminatory basis.").

"if a covered entity elects to provide or cover fertility services but categorically denies them to same-sex couples, it may violate section 1557's prohibition on sex discrimination."). In other words, a covered entity or Christian employer must cover IVF, surrogacy for all individuals, and fertility treatments that are otherwise in line with Christian belief for a non-married individual or a couple in a non-traditional relationship.

### 1.1.6. No religious exemption under the 2024 Rule

Like the 2016 Rule, the 2024 Rule pays lip service to constitutional and statutory protections for religious institutions and individuals. The 2024 Rule states, for example, that "insofar as the application of any rule requirement would violate applicable Federal protections for religious freedom and conscience, such application shall not be required." 89 Fed. Reg. at 37,532; *see also id.* at 37,533 ("We are committed to affording full effect to Congress's protections of conscience and religion, as detailed in § 92.302 and the Department's issuance of its final rule, Safeguarding the Rights of Conscience as Protected by Federal Statutes."). But these token statements are not a religious exemption or a promise of non-enforcement against religious organizations. To the contrary, Defendants ignored what the law requires to protect religious freedom, as previously stated in the decisions of this District, the District of North Dakota, and the Fifth and Eighth Circuits—and Defendants have, since their original contraceptive mandate announced in 2010, vigorously contested over 200 lawsuits seeking religious freedom relief from various contraceptives, gender transition, and abortion health plan coverage mandates.[6]

---

[6] *See, e.g.,* ECF No. 1, Complaint, *Catholic Benefits Ass'n v. Burwell*, No. 3:16-cv-0432 (D.N.D., Dec. 28, 2016), consolidated into *Religious Sisters II*, 55 F.4th 583 (8th Cir. 2022), where the amended final judgment did not enter until October 10, 2023, ECF No. 170, *Religious Sisters of Mercy et al.,* No. 3:16-cv-432, and which even then required the same Catholic association to file a sequel lawsuit, *Catholic Benefits Ass'n v. Becerra*, No. 3:23-cv-00203-DW-ARS (D.N.D. October

As the courts have recognized, there are three distinct problems with such administrative pronouncements. *First*, the statements are not a promise of non-enforcement and never have been. *See Franciscan Alliance II*, 47 F.4th at 377 (explaining that HHS's "promise" to comply with RFRA "was so vague that the scope of liability was both 'unknown by the [defendant] and unknowable to those regulated by it.'"); *Religious Sisters II*, 55 F.4th at 606 ("Although the government maintains that it 'will comply' with RFRA, its promise is 'so vague that the scope of liability is both unknown by the government and unknowable to the plaintiffs.'" (cleaned up)). Defendants repeatedly emphasize it must evaluate any request for religious exemption on a case-by-case basis, taking into account "any harm an exemption could have on third parties." 89 Fed. Reg. at 37,656–57; *see also id.* at 37,532.[7] The District of North Dakota aptly described Defendants' position of forcing religious organizations to "withstand a case-by-case analysis . . . of their religious preferences" as "[g]overnment harassment of religious organizations." *Christian Emps. All. v. U.S. Equal Opportunity Comm'n*, 2022 WL 1573689, at *5 (D.N.D. May 16, 2022).

*Second*, Defendants continue to refuse to adopt the categorical religious exemptions required by law. As explained previously, Title IX requires a categorical religious exemption—yet the 2024 Rule doubles down on the 2016 Rule's approach and refuses to incorporate that exemption. *E.g.*, 89 Fed. Reg. at 37,533 (attempting to explain that the exemption has not been incorporated because

---

13, 2023), a case that HHS and EEOC continue to vigorously contest. The government's action prompted one court recently to remark: "One would think after all this litigation, the government would respect the boundaries of religious freedom. Instead, it seems the goal may be to find new ways to infringe on religious believers' fundamental rights to the exercise of their religions. *Catholic Benefits Association*, 2024 WL 4315021 *1.

[7] There is no "*third*-party harm" exception to free exercise protections. *Burwell v. Hobby Lobby*, 573 U.S. 682, 729 n.37 (2014)

it would "raise unique concerns."). Indeed, in the 2016 Rule and the ensuing litigation, Defendants took the position that the best way to resolve religious exceptions is for *Defendants*— not the court, as authorized by RFRA, 42 U.S.C. § 1983, and the APA—to grant or deny religious exemptions, and that this provided religious objectors adequate protection. *See, e.g.*, Defs.' Opp'n to Pls.' Mot. Prelim. Inj. at 2–3, *Christian Emps. All. v. U.S. Equal Opportunity Comm'n*, No. 1:21-CV-195, 2022 WL 1573689 (D.N.D. May 16, 2022) (ECF No. 18) (emphasis added) (asserting that "both agencies' affirmation that any future decisions about whether to file any enforcement actions will account for RFRA and other religious defenses"); *id.* at 13 ("Indeed, the agency materials that CEA challenges, such as the HHS Notification and EEOC Document, stress that any future enforcement action based on gender-identity discrimination will be fact-specific and account for all relevant religious-practice exemptions, as well as RFRA."); *id.* at 24 ( ame).

*Third*, HHS trumpets a new religious exemption consultation provision that is supposed to address these concerns. 89 Fed. Reg. 37,655–56; 92,301–02 (to be codified at 29 C.F.R. § 92.302). Under this provision, a conscientiously objecting religious employer may "seek assurance" from HHS that it is exempt from one or more of the immoral mandates identified in this motion. But courts have already noted the numerous problems with this "solution." Those problems begin with the decisionmaker being the Office of Civil Rights, an office within HHS that has, by word and deed, minimized religious liberty protections. This has been seen in the office rejecting the Title IX religious exemption, opposing categorical religious exemption, and refusing to grant religious exemptions in lawsuits brought by other religious associations, including the Catholic Benefits Association, the Christian Medical and Dental Association, and the Christian Employers Alliance. Additionally, the applicant is required to provide evidence that it has never performed

the objectionable procedure. 89 Fed. Reg. at 37,657. Thus, HHS would disqualify a Christian hospital that performed a hysterectomy for a cancer patient but declined the same for a gender dysphoric patient. And against explicit Supreme Court analysis directed at HHS itself, HHS insists that it will weigh the harm to a third party against the applicant's religious liberty interest. 89 Fed. Reg. at 37,656–57; *contra Hobby Lobby*, 573 U.S. at 729 n.37 ("Nothing in the text of RFRA or its basic purposes supports giving the Government an entirely free hand to impose burdens on religious exercise so long as those burdens confer a benefit on other individuals. . . . By framing any Government regulation as benefiting a third party, the Government could turn all regulations into entitlements to which nobody could object on religious grounds, rendering RFRA meaningless."). Moreover, if HHS rejects an application, it promises to commence an enforcement action against the applicant. 89 Fed. Reg. at 37,657. But if HHS grants such an application, the religious exemption it recognizes shall have no legal effect outside of HHS administrative process. *Id.* at 37,703. Finally, HHS has stated that, upon receipt of a FOIA request, it will disclose the names and submissions of those who consulted with HHS about a religious exemption. It thus creates a "Hall of Shame" opportunity for activists ready to punish those seeking protection. *Id.* at 37,555, 37,660.

In a hearing before the District of North Dakota in *Christian Employers Alliance*, Defendants made clear just how skewed their understanding of religious freedom is. There, Defendants took the position that a religious organization's right to protection from the AGT Mandate depended on where that organization was located. If, for example, an organization was based in a metropolitan area like Dallas, it was likely entitled to a religious exemption. But, if the organization was based in a rural area like the panhandle, the organization would likely not be entitled to religious protections

afforded by law according to Defendants. *See* ECF No. 41, *Christian Employers Alliance*, No. 21-cv-00195, 56:23–58:22 (D.N.D. May 17, 2022). Had Defendants wanted to do anything other than add an additional step to their "legal Penrose staircase" to frustrate the rights of religious employers like Plaintiffs, *Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 373 (N.D. Tex. 2021), they would have simply incorporated Title IX's religious exemption.[8]

### 1.1.7.   The unconstitutional burdens imposed by the 2024 Rule.

The 2024 Rule's reinterpretation of Section 1557 to include "gender identity," abortion, and infertility, coupled with its expansive definition of a "covered entity," creates two effects central to this dispute.

**Coverage.** *First*, the 2024 Rule, like the 2016 Rule, requires covered insurers, PBMs, and TPAs to cover gender transition procedures and abortion if they cover analogous services in other contexts. *See* 89 Fed. Reg. at 37,700–01, *to be codified at* 45 C.F.R. § 92.206; 89 Fed. Reg. at 37,576. For example, if a provider specializing in reconstructive surgery would perform a mastectomy for a woman suffering from breast cancer, the 2024 Rule requires that provider to perform a mastectomy for a minor who identifies as a transgender man. *See* 87 Fed. Reg. at 47,867 ("[A] gynecological surgeon may be in violation of the rule if they accept a referral for a hysterectomy but later refuse to perform the surgery upon learning the patient is a transgender man."); *see also*

---

[8]    They would have also incorporated Title VII's religious exemption in § 702(a) of the Civil Rights Act of 1964. 42 U.S.C. §§ 2000e–1(a), 2000e(f). "Section 702(a) permits a religious employer to require the staff to abide by religious rules" and to discriminate on the basis of sex in employment-related decisions if such discrimination is "related to religious doctrine." *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 946 (7th Cir. 2022) (Easterbrook J., concurring). Here, it is undisputed that Plaintiffs cannot cover gender-transition services or immoral infertility treatment for their members because of their Christian and Biblical beliefs.

Compl. ¶¶ 38–40 (listing the procedures required to be covered under Defendants' definition of "gender-affirming care"). Similarly, covered entities must cover abortions if they will cover analogous services in other contexts. *See, e.g.*, *Religious Sisters I,* 513 F. Supp. 3d at 1124 ("The same concept theoretically applied for abortions. So if an obstetrician performed dilation and curettage procedures for miscarriages, then the 2016 Rule barred a later refusal to perform those procedures for abortions.").

**Speech.** *Second,* covered employers are required to alter their speech or remain silent regarding their beliefs. For example, the 2024 Rule mandates revisions to healthcare program and activity's written policies, requiring express affirmations that gender transition-related procedures will be provided, 89 Fed. Reg. at 37,697, *to be codified at* 45 C.F.R. § 92.10(a)(1)(i), even if such revisions do not reflect the entity's medical judgment, values, or beliefs. The 2024 Rule similarly requires covered entities to train their employees regarding the "non-discrimination" requirements in the Rule related to gender-affirming care, abortion, and artificial reproductive technology. 89 Fed. Reg. at 37,697, *to be codified at* 45 C.F.R. § 92.9. Under the 2024 Rule, covered entities must state that males can become pregnant, give birth, and breastfeed. As HHS explains in the 2022 NPRM, healthcare providers are responsible for "'discrimination, stigma, and erasure'" if they speak or act in way that treats "pregnancy and childbirth . . . as something exclusively experienced by . . . women." 87 Fed. Reg. at 47,865. The 2024 Rule also requires that covered entities applying for federal funds affirm in advance that they will comply with the Rule, 89 Fed. Reg. at 37,596, *to be codified at* 45 C.F.R. 92.5(a), and, once approved, post notices regarding compliance with the Rule, 89 Fed. Reg. at 37,597–98, *to be codified at* 45 C.F.R. 92.10.

**2. The EEOC AGT Mandate's governance of employer health plans**

To address the fact that TPAs and non-covered-entity health plans "are generally not responsible for the benefit design of the self-insured plans they administer," the 2016 Rule said HHS would refer complaints regarding health plans to EEOC. 81 Fed. Reg. at 31,432. "Where, for example, [HHS] lacks jurisdiction over an employer responsible for benefit design, [HHS] typically will refer or transfer the matter to the EEOC and allow that agency to address the matter." *Id.* The 2024 Rule reiterates this referral relationship. The 2024 Rule declares that although HHS lacks jurisdiction over "employment practices," 89 Fed. Reg. at 37,552, it will "transfer matters to the EEOC or DOJ where OCR lacks jurisdiction over an employer," *id.* at 37,624, 37,627; *see also* 87 Fed. Reg. at 47,877 ("For example, OCR will transfer matters to the EEOC where OCR lacks jurisdiction over an employer responsible for the benefit design of an employer-sponsored group health plan."). HHS has decided that, for non-healthcare entities, Title VII is better suited to "address claims that an employer has discriminated in the provision of benefits, including health benefits, to its employees." 81 Fed. Reg. at 31,437

This referral mechanism is based on EEOC's interpretation of Title VII to require coverage of gender-transition services in covered-employer health plans. The "EEOC interprets and enforces Title VII's prohibition of sex discrimination as forbidding any employment discrimination based on gender identity or sexual orientation." EEOC, What You Should Know About EEOC and the Enforcement Protections for LGBT Workers (captured Nov. 23, 2020), attached here as Exhibit B, p. 1. Examples of LGBT-related claims that EEOC saw as unlawful sex discrimination included: "[f]ailing to hire an applicant because she is a transgender woman" and "discriminating against or harassing an employee because of his or her . . . gender identity, . . . for example, on the basis of transgender status." *Id.* at 2. The EEOC has found "intentional discrimination against a

25

transgender individual because that person's gender identity is, by definition, discrimination based on sex and therefore violates Title VII." *Id.* at 3 (citing *Macy v. Holder*, EEOC Appeal No. 0120120821, 2012 WL 1435995 (April 20, 2012)). The EEOC continues to follow this interpretation of Title VII. *See, e.g.*, EEOC, *Fact Sheet: Recent EEOC Litigation Regarding Title VII & LGBT-Related Discrimination*, https://perma.cc/Y9FW-MA5T (last visited June 24, 2024). In *Lange v. Houston Cnty.* No. 22-13626 (11th Cir. 2023), for example, the United States filed an *amicus* brief in support of a plaintiff who alleged discrimination under Title VII by her employer for its categorical exclusion of "gender-affirming care" from the employer's health plan. Brief for the United States as *Amicus Curiae* Supporting Plaintiff-Appellee and Urging Affirmance on the Issues Addressed Herein, *Lange v. Houston Cnty., Georgia*, No. 22-13626, (Mar. 17, 2023), attached to Complaint as Exhibit A. In that brief, the United States argued that an employer-sponsored health insurance plan violates Title VII if it excludes coverage for medical treatments only when they are needed to provide gender-affirming care." *Id.* at 10. The United States filed this brief because of its "substantial interest . . . [in] the proper application of the prohibition on sex discrimination in Title VII . . . to an employer's denial of health insurance benefits to a transgender worker" in light of EEOC's and DOJ's "enforcement authority under Title VII." *Id.* at 1–2.

As a result of its coverage, the AGT Mandate has been enjoined twice in this District, twice in the District of North Dakota, and once in the Southern District of Mississippi.[9]

---

[9] *Tennessee v. Becerra*, 2024 WL 3283887 (S.D. Miss. July 3, 2024) (enjoining AGT Mandate in favor of a coalition of States); *Texas v. Becerra*, 2024 WL 4490621, at *2 (E.D. Tex. Aug. 30, 2024) (staying AGT nationwide); *Neese v. Becerra*, 640 F. Supp. 3d 668, 668–70 (N.D. Tex. 2022) (enjoining HHS's interpretation of Section 1557 to require gender-affirming care); *Christian Emps. All. v. United States Equal Opportunity Comm'n*, 719 F. Supp. 3d 912 (D.N.D. 2024) (enjoining the AGT Mandate under RFRA in favor of a religious association of Christian employers); *Neese v.*

### 3.   The Pregnant Worker Fairness Act and the PWFA Rule

Congress passed the Pregnant Workers Fairness Act ("PWFA") to provide protection for pregnant women seeking workplace accommodations. *See* Consolidated Appropriations Act, 2023, div. II, Pub. L. No. 117-328, 136 Stat. 4486, 6084 (2022) (codified at 42 U.S.C. § 2000gg *et seq.*). Prior to this law, federal protections for pregnant workers were limited and patchwork. The PWFA aimed to protect pregnant women and new mothers in the workforce by requiring employers to accommodate any "known limitation[s] . . . related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." 42 U.S.C. §§ 2000gg(4), 2000gg-1.

The PWFA prohibits employers from taking adverse employment actions or denying employment opportunities because an employee requested reasonable accommodation related to pregnancy. 42 U.S.C. § 2000gg-1. Employers may not discriminate against pregnant women who seek an accommodation. Prohibited practices include: (1) refusing to provide reasonable pregnancy accommodations; (2) forcing an employee to accept a pregnancy accommodation that is not reasonable; (3) denying employment opportunities because of the employee's need for a reasonable pregnancy accommodation; (4) forcing an employee to take paid or unpaid leave rather than providing a reasonable pregnancy accommodation; or (5) taking an adverse employment action against an employee because they requested a reasonable pregnancy accommodation. *Id.* § 2000gg-1.

---

*Becerra*, 640 F. Supp. 3d 668, 668–70 (N.D. Tex. 2022) (enjoining HHS's interpretation of Section 1557 to require gender-affirming care); *Religious Sisters I*, 513 F. Supp. 3d at 1142 (enjoining the AGT Mandate under RFRA in favor of several religious organizations), *aff'd in relevant part, Religious Sisters II*, 55 F.4th at 583; *Franciscan Alliance I*, 227 F. Supp. 3d at 696 (enjoining the 2016 § 1557 Rule)

The PWFA also bars retaliation and interference against pregnant women: (i) "[n]o person shall discriminate against any employee because such employee has opposed any act or practice made unlawful by this chapter," 42 U.S.C. § 2000gg-2(f)(1); and (ii) "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of such individual having exercised or enjoyed, or on account of such individual having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." *Id.* § 2000gg-2(f)(2).

The PWFA applies to employers with fifteen or more employees, 42 U.S.C. § 2000gg(2)(B), and it incorporates the Title VII religious exemption. *See id.* § 2000gg-5(b). The PWFA provides for private enforcement actions from private parties. In addition, the EEOC has investigative and enforcement powers akin to those in Title VII. *Id.* § 2000gg-2(a)(1).

In 2023, the EEOC issued a proposed rule implementing the PWFA. The proposed rule stated that "having . . . an abortion" is included in the "examples of pregnancy, childbirth, or related medical conditions," 88 Fed. Reg. at 54,774, and defined "pregnancy, childbirth, and related medical conditions" as including "current pregnancy; past pregnancy; potential or intended pregnancy . . ." with "related medical conditions . . . including but not limited to, termination of pregnancy, . . . abortion;  infertility; [and] fertility treatment." 88 Fed. Reg. at 57,767. The proposed rule generated substantial comments opposing the radical expansion of the PWFA to include conduct ranging from direct abortion to immoral fertility treatments that was not included in the text of the Act. Approximately 54,000 comments urged "the Commission to exclude abortion from the definition of 'pregnancy, childbirth, or related medical conditions.'" 89 Fed. Reg. 29,096, 29,104 (April 19, 2024).

The PWFA Rule doubled down on the proposed rule's definition and requires covered employers to accommodate employee abortions and immoral fertility treatments. *See* Implementation of the Pregnant Workers Farness Act, 89 Fed. Reg. 29,096, 29,183 (April 29, 2024). The EEOC expanded the definition of "pregnancy, childbirth, or related medical conditions" to include "termination of pregnancy, including . . . abortion" and "fertility treatment." 89 Fed. Reg. at 29,106, 29,183, 29 C.F.R. § 1636.3(b). "Fertility treatment" includes immoral fertility treatments like in vitro fertilization ("IVF"). 89 Fed. Reg. at 29,102, 29,190.

Two of the five EEOC commissioners voted against the PWFA Rule, and one published a rare statement expressing her dissent. Andrea Lucas, Statement re: Vote on the Final Rule to Implement Pregnant Workers Fairness Act 1, https://perma.cc/7YFL-85GT. Commissioner Lucas concluded the PWFA Rule "cannot reasonably be reconciled with the text" of the PWFA. And the "Commission paradoxically interprets a statute requiring employers to accommodate a worker's pregnancy and childbirth into a provision that also requires accommodation of a worker's inability to become pregnant." *Id.* at 7. The PWFA Rule was subsequently enjoined in this District, the District of North Dakota, and the Western District of Louisiana. *Texas v. Garland*, 719 F. Supp. 3d 521, 599 (N.D. Tex. 2024); *Catholic Benefits Association*, 2024 WL 4315021; *Louisiana v. Equal Emp. Opportunity Comm'n*, 705 F. Supp. 3d 643, 664 (W.D. La. 2024)

### 4. EEOC's Harassment Guidance

Concurrent with EEOC promulgating the PWFA Rule, it adopted Harassment Guidance under Title VII addressing sexual harassment. *See* EEOC, Enforcement Guidance on Harassment in the Workforce, 14-18, § II(A)(5)(b)-(c) (April 29, 2024) ("Harassment Guidance"), https://perma.cc/7DUD-GHHA. The Harassment Guidance addresses many scenarios that may properly be understood as violating Title VII's prohibition on employment discrimination (with

which Plaintiffs take no issue). But the EEOC also expands Title VII to cover potential employment conflicts for areas purportedly related to sex discrimination that burden Plaintiffs' Christian values in at least three scenarios: (1) use of pronouns contrary to biological sex; (2) the use of private spaces traditionally reserved to single sex; and (3) the ability to speak about human sexuality. *See* Harassment Guidance at 17–18, nn. 37, 38, 40, 42 and 43 and accompanying text, Example 15.

As to pronouns, EEOC interprets Title VII to prohibit the "intentional use of a name or pronoun inconsistent with the individual's known gender identity (misgendering)." *Id.* at 17, n.42 and accompanying text. The Harassment Guidance continues with "Example 15: Harassment Based on Gender Identity," including "misgendering" as a basis for harassment liability. *Id.* at 17–18, § II(A)(5)(c). As to the use of private spaces traditionally reserved for a single sex, the EEOC reads Title VII as prohibiting "harassing conduct" on the basis of "gender identity" to include "the denial of access to a bathroom or other sex-segregated facility consistent with the individual's gender identity." *Id.* at 17, n.43 and accompanying text. Access to a bathroom traditionally reserved to one sex by a member of the opposite sex is given emphasis: "In addition to being part of a harassment claim, denial of access to a bathroom consistent with one's gender identity may be a discriminatory action in its own right." *Id.* at 17. As to the ability to speak about human sexuality, the EEOC interprets Title VII to prohibit "harassment based on a woman's decision about contraception or abortion." *Id.* at 15, § II(A)(5)(b). EEOC also interprets Title VII to prohibit harassment based on an employee's decision to transition from his or her biological sex. *See id.* at 17–18, § II(A)(5)(c). And EEOC makes clear that sexual harassment can be based on employer

communications that an employee considers to constitute "offensive comments," "derogatory terms," or "slurs." *Id.* at 15–17, nn. 30, 35, 38, 39.

Although EEOC calls this mere "guidance," it is binding on covered employers because EEOC "'bases enforcement actions on the policies or interpretations formulated in the document' [and] 'leads private parties to believe' [EEOC] will take action 'unless they comply with the terms of the document.'" *Catholic Benefits Association*, 2024 WL 4315021, at *7 (citations omitted). Accordingly, it is the policy and official position of the EEOC, based on the Harassment Guidance and the agency's enforcement actions, that an employer's continuing use of pronouns consistent with an employee's sex; its expression of Christian values regarding abortion, fertility treatments, and gender transition; and its preservation of private spaces to one sex may now violate Title VII's ban on sex discrimination and harassment.

Whether by EEOC enforcement, class action lawsuit, or employee lawsuit, a successful claim under the PWFA or Title VII could result in compensatory and punitive damages, attorneys' fees, and costs. The EEOC has authority to investigate Title VII violations and will ask violators to take corrective action for the supposedly discriminatory behavior. 42 U.S.C. § 2000e-5(a). And the Department of Justice may bring a federal lawsuit to enforce Title VII and the PWFA. *See, e.g.*, 81 Fed. Reg. at 31,439, 31,441. Both the PWFA and Title VII create private rights of action. The District of North Dakota subsequently enjoined the EEOC from enforcing the Harassment Guidance against members of a religious association. *Catholic Benefits Association*, 2024 WL 4315021, at *1.

## PROCEDURAL HISTORY

Plaintiffs filed suit on October 15, 2024. After conferral, the parties agreed to a stay of Plaintiffs' Administrative Procedure Act claims and a briefing schedule for the parties' cross-motions for partial summary judgment on Plaintiffs' remaining claims.

## STANDARD OF REVIEW

### 1. Preliminary and permanent injunction

Rule 65 of the Federal Rules of Civil Procedure authorizes district courts to grant injunctive relief. When considering a motion for preliminary or permanent injunction, four factors control: (1) a substantial likelihood the movant will prevail on the merits of the case; (2) a substantial threat of irreparable harm to the movant if an injunction is not granted; (3) the balance between this harm and any injury that granting the injunction will inflict on other parties; and (4) the public interest. *Franciscan Alliance I*, 227 F. Supp. 3d at 676; *Abraham v. Alpha Chi Omega,* 708 F.3d 614, 627 (5th Cir. 2013). Federal Rule of Civil Procedure 65(a)(2) permits consolidation of the preliminary injunction proceedings with merits proceedings. Moreover, Federal Rule of Civil Procedure 57 permits a court to order a "speedy hearing of a declaratory-judgment action." Pursuant to these rules, the Court should consolidate the preliminary-injunction proceedings with its determination on the merits, declare Plaintiffs' and their members' rights, and enjoin Defendants from enforcing the challenged portions of the mandates against Plaintiffs and their members.

### 2. Summary judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### 3. Declaratory judgment

Under the Declaratory Judgment Act, a district court may "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought" so long as there is "a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201. "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941). "The purpose of the Declaratory Judgment Act is to settle "actual controversies" before they ripen into violations of law or breach of some contractual duty." *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 926 (5th Cir. 2023).

### ARGUMENT

Defendants do not dispute Plaintiffs' sincerely held religious beliefs. Therefore, no further factual development is necessary. Rather than waste judicial resources with two rounds of identical briefing at the preliminary and summary-judgment stages, Plaintiffs respectfully move for a permanent injunction of the immoral mandates as illegal violations of their statutory and constitutional rights. If the Court determines that further factual development is necessary, Plaintiffs request the Court preliminarily enjoin the mandates until final judgment.

### 1. This case is justiciable.

#### 1.1. Plaintiffs face Article III injury.

Plaintiffs have standing to challenge the PWFA Rule, the Harassment Guidance, and the AGT Mandate. This is so because Plaintiffs and their members face a credible threat of enforcement. Specifically, HHS's and EEOC's contention that they have not yet to date evaluated whether

Plaintiffs are entitled to a religious exemption from the PWFA Rule, the Harassment Guidance, and the AGT Mandate and that that determination must occur on a "case-by-case" basis "constitutes 'a concession that [they] may' seek enforcement." *Catholic Benefits Association*, 2024 WL 4315021, at *4 (quoting *Franciscan Alliance II*, 47 F.4th at 372). Indeed, the EEOC regularly prosecutes covered employers for "misgendering" employees and for "gender identity" discrimination. *See* Harassment Guidance § 5.c, n.42 (collecting enforcement actions).[10] As for the AGT Mandate, notwithstanding this District's (and the Fifth and Eighth Circuit's) holdings that it is illegal, the Government has only doubled down on its interpretations of Section 1557 and Title VII. It filed an *amicus* brief in the Eleventh Circuit arguing that Title VII requires coverage of gender-affirming care, *see* § 2, pp. 25-26, *supra*, and has issued the 2024 Rule. The EEOC has recently stated that applying Title VII to transgender individuals is a "top Commission enforcement priority." *See* p. 42, *infra*. Indeed, the Government recently conceded that "there have been complaints that have likely gone through the conciliation process" concerning the Mandate. *Christian Emps. All. v. U.S. Equal Opportunity Comm'n*, 2022 WL 1573689, at *5 (D.N.D. May 16, 2022). And like *Susan B. Anthony List*, the threat of private enforcement exists alongside Government enforcement. *E.g.*, *Hammons v. Univ. of Maryland Med. Sys. Corp.*, 551 F. Supp. 3d 567, 572 (D. Md. 2021) (denying motion to dismiss in 1557 suit against Catholic hospital); *Star Merchant v. SSM Health Care of Wisc., Inc.*, No. 24-cv-299 (D. W.D. Wisc.) (EEOC processed

---

[10] *E.g.*, *Roxanna B. v. Yellen*, EEOC DOC 2020004142, 2024 WL 277871, at *12 (Jan. 10, 2024)(liability imposed for "misgendering and deadnaming"); *Jameson v. U.S. Postal Serv.*, EEOC Appeal No. 0120130992, 2013 WL 2368729, at *2 (May 21, 2013) (misuse of pronoun may constitute sex-based harassment); *Lusardi v. Department of the Army*, EEOC Appeal No. 0120133395, 2015 WL 1607756 at *10-13 (Apr. 1, 2015) (liability imposed for supervisor's use of incorrect pronouns refusal to allow use of restroom consistent with gender identity).

charge of discrimination and issued right to sue latter in case where employer, for religious reasons, excluded gender transition services from its health plan).

Article III injury in the pre-enforcement context is present if Plaintiffs show they have an "intention to engage in a course of conduct arguably affected with a constitutional interest," their "intended future conduct is arguably proscribed by the policy in question," and "the threat of future enforcement of the [challenged policies] is substantial." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (cleaned up and quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). Those requirements are met here. First, Plaintiffs' intended conduct is affected with a constitutional interest: they seek to operate consistent with their Christian beliefs. Second, Plaintiffs' refusal to accommodate employee abortions, immoral infertility treatments, false pronouns, access to single-sex spaces, and gender-affirming care is arguably proscribed by Defendants' interpretations of Section 1557, the PWFA, and Title VII. That is sufficient for pre-enforcement standing. Courts "assume a credible threat of prosecution" in a "pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict" First Amendment rights. *Speech First*, 979 F.3d at 335 (collecting cases). "Where the enforcement of a regulatory statute would cause plaintiff to sustain a direct injury, the action may properly be maintained, whether or not the public officer has 'threatened' suit; the presence of the statute is threat enough." *United Food & Com. Workers Int'l Union, AFL-CIO, CLC v. IBP, Inc.*, 857 F.2d 422, 428 (8th Cir. 1988). But were that not enough, Defendants' refusal to disavow enforcement of the mandates is itself a credible threat as explained above.

Further, Plaintiffs have suffered regulatory harm. An "additional regulatory burden . . . undeniably [creates] a . . . 'case or controversy.'" *Ass'n of Am. Railroads v. Dep't of Transp.*, 38

F.3d 582, 586 (D.C. Cir. 1994); *see also Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) (same). Plaintiffs and their members are objects of the PWFA Rule, the Harassment Guidance, and the AGT Mandate. They have not adopted the requisite accommodating employee policies and would incur compliance and training burdens if forced to do so. 89 Fed. Reg. 29,096, 29,175-77 (Apr. 19, 2024) (detailing compliance cost); 89 Fed. Reg. at 37,679, 37,680-81 (same); *see also Louisiana*, 705 F. Supp. 3d at 656 (EEOC forcing religious employer to "choose between two untenable alternatives . . . constitutes injury"). In addition, "[t]he burden of investigation and possible litigation" of Plaintiffs' religious defenses to a Section 1557 or Title VII enforcement action is "added regulatory burden and compliance costs" and therefore Article III injury. *Catholic Benefits Association*, 2024 WL 4315021, at *4; *see also Louisiana v. EEOC*, 705 F. Supp. 3d 643, 664 (W.D. La. 2024) (same); *Christian Emps. All. v. EEOC*, 2022 WL 1573689, at *5 (D.N.D. May 16, 2022) (requiring religious organizations "to prove they are religious or evaluating whether their religious preferences can withstand a case-by-case analysis is a sufficient injury.").

**1.2. Plaintiffs' claims are ripe for adjudication.**

Article III standing and ripeness often "boil down to the same question." *Susan B. Anthony List*, 573 U.S. at 157, n. 5 (citation omitted). As in *Braidwood Management*, this case is apt for judicial resolution because no additional factual development is needed to issue declaratory and injunctive relief. 70 F.4th at 930. Plaintiffs have set forth the necessary facts under oath in its complaint and in motion, and this case "present[s] purely legal questions." *See CropLife Am. v. EPA*, 329 F.3d 876, 884 (D.C. Cir. 2003) (finding that petitioners presented a "purely legal question" that was ripe for review). At the same time, denying judicial review would inflict significant practical harm

on Plaintiffs by forcing them to either follow their religious beliefs or face serious and harsh penalties under the statutes. *Braidwood Mgmt.*, 70 F.4th at 931.

### 1.3. UIP has associational standing to represent its members.

"It is well established that an association is permitted to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Franciscan Alliance I*, 227 F. Supp. 3d at 680 (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). UIP meets this standard. First, UIP has provided the declaration of one of its members, PublicSquare, which establishes that its members would have standing to sue in their own right. Compl. ¶ 162; Exh. E. Second, the interests UIP seeks to protect in this lawsuit are germane to its purpose to "[s]upport [its] employer members that, as part of their Christian witness and exercise, provide health or other benefits to their respective employees in a manner consistent with Christian values; and advocate for their religious freedom and other constitutional rights so they might conduct their work and business according to Christian values." Compl. ¶ 154. Third, where, as here, the association seeks only "declaratory and injunctive relief," individual member participation is not required. *Hunt*, 432 U.S. at 344; *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (same).

### 1.4. Traceability and redressability are present.

"[W]hen a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." *Bronson v. Swensen,* 500 F.3d 1099, 1110 (10th Cir.2007); *see also Okpalobi v. Foster,* 244 F.3d 405, 426 (5th Cir. 2001) (en banc). The issue is also

redressable because the Court's decision would "relieve a discrete injury" of potential enforcement. *Catholic Benefits Association*, 2024 WL 4315021, at *6 *(*quoting *Massachusetts v. EPA*, 549 U.S. 497, 525 (2007)). "If the rules were vacated as substantively unlawful, it is indeed likely that the members' injuries would be redressed." *Id.* (quoting *Iowa League of Cities v. EPA*, 711 F.3d 844, 870 (8th Cir. 2013)).

**2.   Plaintiffs will succeed on the merits.**

### 2.1. The AGT Mandate, the PWFA Rule, and Harassment Guidance each violate the Religious Freedom Restoration Act (Count 1).

Congress enacted RFRA "to provide very broad protection for religious liberty." *Hobby Lobby*, 573 U.S. at 693. RFRA forbids government from "substantially burden[ing] a person's exercise of religion" unless the burden (1) "is in furtherance of a compelling governmental interest" and (2) "is the least restrictive means of furthering that compelling interest." 42 U.S.C. § 2000bb-1(b). "A person whose religious practices are burdened in violation of RFRA 'may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief.'" *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 424 (2006) (quoting 42 U.S.C. § 2000bb-1(c)). If a substantial burden exists, then the government assumes the obligation to meet the "exceptionally demanding" strict scrutiny standard. *Hobby Lobby*, 573 U.S. at 728. RFRA requires courts to interpret the "broad protection of religious exercise" to the "maximum extent" possible. *Hobby Lobby*, 573 U.S. at 696 & n.5.

### 2.1.1.       Substantial Burden – Harassment Guidance & PWFA Rule

RFRA first asks whether the challenged implementations of Section 1557 and Title VII impose a substantial burden on the Plaintiffs' exercise of religion. *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 942 (N.D. Tex. 2019). "First, would non-compliance have substantial adverse practical

consequences?" *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 692 (2020) (Alito, J., concurring). "Second, would compliance cause the objecting party to violate its religious beliefs, as it sincerely understands them?" *Id.* (emphasis omitted).

The EEOC's interpretations of the PWFA and Title VII resulting in the PWFA Rule and the Harassment Guidance impose a substantial burden on Plaintiffs' religious exercise. *See, e.g.*, Compl. ¶¶ 14, 43, 129–30, 157, 159. A substantial burden is one that imposes "substantial adverse practical consequences" on an employer for following its religious beliefs or that "cause[s] the objecting party to violate its religious beliefs" to comply with the law. *Little Sisters of the Poor*, 591 U.S. at 692 (Alito, J., concurring) (citation omitted). Plaintiffs' religious beliefs prevent them from cooperating with the portions of the laws and interpretations challenged here. Compl. ¶¶ 14, 43, 129–30, 157, 159. As a result, being required to provide accommodations under the PWFA or the PWFA Rule for abortion and immoral fertility treatment; being forced under Title VII or the Harassment Guidance to use false pronouns upon an employee's request; being mandated to refrain from expressing Biblical and Christian teaching regarding sexual issues; and being required to give employees of one sex access to private spaces reserved for those of the other sex would be contrary to sincerely held religious beliefs. *Catholic Benefits Association*, 2024 WL 4315021, at *8; *see also Christian Emps. All. v. EEOC*, 2024 WL 935591, at *8 (D.N.D. Mar. 4, 2024) (finding substantial burden when Plaintiff "must either comply with the EEOC and HHS mandates by violating their sincerely held religious beliefs or else face harsh consequences like paying fines and facing civil liability."). Under the PWFA and Title VII as interpreted by the EEOC under the PWFA Rule and the Harassment Guidance, Plaintiffs face the choice of complying with laws that are manifestly contrary to their Christian values or facing civil liability, injunctive relief, and

protracted litigation by either the EEOC or private parties. *See* 42 U.S.C. § 2000gg-2(a) (remedies); 42 U.S.C. § 2000e-5 (remedies). This false choice is untenable.

### 2.1.2.  Substantial Burden – AGT Mandate

This Court's earlier findings regarding the AGT Mandate and substantial burden are on all fours with the allegations in Plaintiffs' complaint here. As noted previously:

> In regards to whether the [2016] Rule places substantial pressure on Plaintiffs to abstain from religious exercise, the Court finds—and the parties agree—that the Rule's prohibition of categorical exclusions of transitions and abortions forces Plaintiffs to make an individualized assessment of every request for performance of such procedures or coverage of the same. The Rule therefore places substantial pressure on Plaintiffs to perform and cover transition and abortion procedures. The Rule's prohibition of categorical exclusions also forces Plaintiffs to provide the federal government a nondiscriminatory and "exceedingly persuasive justification" for their refusal to perform or cover such procedures. Private Plaintiffs' long-held view that such procedures are immoral and inappropriate in every circumstance is now at odds with the Rule's interpretation of sex discrimination because it requires them to remove the categorical exclusion of transitions and abortions (a condition they assert is a reflection of their religious beliefs and an exercise of their religion) and conduct an individualized assessment of every request for those procedures. "A law that 'operates so as to make the practice of ... religious beliefs more expensive' in the context of business activities imposes a burden on the exercise of religion." Accordingly, the Rule imposes a substantial burden on Private Plaintiffs' religious exercise.

*Franciscan Alliance I*, 227 F. Supp. 3d at 692. Indeed, an "imposition of significant monetary penalties" indisputably qualifies as a substantial burden." *Religious Sisters I*, 513 F. Supp. 3d at 1147–48. And Plaintiffs have carefully detailed their religious beliefs on these topics. Compl. ¶¶ 119-68; Exh. B; Exh. E.

### 2.1.3.  Lack of Compelling Interest – Harassment Guidance & PWFA Rule

The EEOC does not have a compelling interest in burdening Plaintiffs' religious beliefs. To meet this burden, the government must do more than identify "broadly formulated interests justifying the general applicability of government mandates." *Gonzales v. O Centro Espirita*

*Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006); *see also Sharpe Holdings, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 801 F.3d 927, 937 (8th Cir. 2015). Thus, an assertion by the EEOC of its broad "interest in combating discrimination in the workforce" will not suffice. *Religious Sisters I*, 513 F. Supp. 3d at 1148; *see also Franciscan Alliance I*, 227 F. Supp. 3d at 692 ("The Fifth Circuit has held that to satisfy strict scrutiny under RFRA, the government 'must show by specific evidence that [Private Plaintiffs'] religious practices jeopardize its stated interests.'" (quoting *Merced v. Kasson*, 577 F.3d 578, 592 (5th Cir. 2009)) (alteration in original)). This can be seen by the fact that Title VII and the PWFA exempt employers with less than 15 employees, leaving about 80 percent of private employers and millions of employees uncovered. 89 Fed. Reg. at 29,151; Richard Carlson, The Small Firm Exemption, 80 St. John's L. Rev. 1197, 1198–99, 1199 n.14 (2006). Similarly, EEOC broadly exempts any employer facing an "undue hardship" from complying with the Final Rule. 89 Fed. Reg. at 29,205. The government cannot excuse small employers and those with cost objections while also claiming "that its non-discrimination policies can brook no departures" for Plaintiffs. *Fulton*, 593 U.S. at 542. The point only grows clearer given numerous other exceptions to EEOC's enforcement position. *See* 42 U.S.C. §§ 2000e; 2000e-1; 2000e-2 (allowing exemptions based on things such as occupational qualifications, private-membership status, and employment of aliens). The EEOC cannot articulate how granting specific exemptions for Plaintiffs will harm the asserted interests in preventing discrimination.

### 2.1.4.   Lack of Compelling Interest – AGT Mandate

With a substantial burden present, the government must demonstrate that the challenged implementations of federal law advance "interests of the highest order." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (citations and internal quotation marks omitted). The Defendants cannot do so here. The Government exempts its own insurers from

Section 1557's AGT Mandate. *Franciscan Alliance I*, 227 F. Supp. 3d at 693. Indeed, Defendants, in the 2020 Rule, conceded to lacking a "compelling interest in forcing the provision, or coverage, of these medically controversial [gender-transition] services by covered entities." 85 Fed. Reg. at 37,188.

The interests proffered in the 2024 Rule likewise do not meet this requirement. The 2024 Rule, like the 2016 Rule, 81 Fed. Reg. at 31,380, asserts Defendants have a compelling interest in ensuring nondiscriminatory access to healthcare, 89 Fed. Reg. at 37,656; 87 Fed. Reg. at 47,825. The EEOC similarly has stated that applying Title VII to transgender individuals is a "top Commission enforcement priority." EEOC, *Fact Sheet: Recent EEOC Litigation Regarding Title VII & LGBT-Related Discrimination*, https://perma.cc/Y9FW-MA5T (last visited June 24, 2024). But the Supreme Court has instructed to look "beyond broadly formulated interests." *O Centro*, 546 U.S. at 431. Rather, courts must "scrutinize the asserted harm of granting specific exemptions to particular religious claimants and to look to the marginal interest in enforcing the challenged government action in that particular context." *Holt v. Hobbs*, 574 U.S. 352, 363 (2015) (cleaned up)). Neither HHS nor the EEOC can articulate how granting specific exemptions for the Plaintiffs will harm the asserted interests in preventing discrimination. *Id.*

> Moreover:
>
> "a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." A mandate for entities subject to Section 1557 and Title VII to perform and cover gender-transition procedures still leaves gaps, including in the government's own healthcare programs. In short, the Court harbors serious doubts that a compelling interest exists. This issue need not be resolved, however, because the Defendants fail to meet the rigors of the least-restrictive-means test.

*Religious Sisters I*, 513 F. Supp. 3d at 1148 (citations omitted).

### 2.1.5.  Lack of Least Restrictive Means - Harassment Guidance & PWFA Rule

To satisfy the least-restrictive-means test, the government must "show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." *Franciscan Alliance I*, 227 F. Supp. 3d at 693 (cleaned up and quotations omitted). "If a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt*, 574 U.S. at 365 (cleaned up). In the RFRA context, "a regulation may constitute the least restrictive means of furthering the government's compelling interests if 'no alternative forms of regulation' would accomplish those interests without infringing on a claimant's religious-exercise rights." *Sharpe Holdings, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 801 F.3d 927, 943 (8th Cir. 2015) (subsequent history omitted) (quoting *Sherbert v. Verner*, 374 U.S. 398, 407 (1963)). The EEOC fails to meet this high burden. This is so because Title VII provides an alternative: a religious exemption for religious employers. *See* 42 U.S.C. § 2000e-1(a). And EEOC's case-by-case approach is "not the least restrictive means, especially in the absence of evidence supporting this position." *Christian Emps. All.*, 2024 WL 935591, at *9.

### 2.1.6.  Lack of Least Restrictive Means – AGT Mandate

This Court's earlier holding regarding less-restrictive means is also dispositive here with respect to the AGT Mandate:

> The least-restrictive-means standard requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party. If the government wishes to expand access to transition and abortion procedures, "the most straightforward way of doing this would be for the government to assume the cost of providing the procedures at issue to any individuals who are unable to obtain them under their health-insurance policies due to their employers' religious objections. The government could also assist transgender individuals in finding and paying for transition procedures available from the growing number of healthcare providers who offer and specialize in those services. The government has failed to demonstrate how exempting Private Plaintiffs pursuant to their religious beliefs

would frustrate the goal of ensuring "nondiscriminatory access to health care and health coverage, and the government has numerous less restrictive means available to provide access and coverage for transition and abortion procedures.

*Franciscan Alliance I*, 227 F. Supp. 3d at 693. The Government Defendants' AGT Mandate thus violates the Plaintiffs' rights under RFRA.

Because HHS and EEOC have violated RFRA, Plaintiffs are entitled to their attorneys' fees and costs. 42 U.S.C. § 1988(b). Plaintiffs respectfully request the Court award those fees and costs.

### 2.2. The AGT Mandate, the PWFA Rule, and Harassment Guidance each violate the Free Exercise Clause (counts 2-4).

Given RFRA's dispositive effect here, the Court need not address Plaintiffs' remaining claims. If the Court disagrees that Plaintiffs are not entitled to relief under RFRA, however, the First Amendment provide additional bases to enter judgment in Plaintiffs' favor.

HHS and EEOC have violated "bedrock" Free Exercise rights in two ways. First, a policy that burdens religion while reserving discretion for the government "to decide which reasons for not complying with the policy are worthy of solicitude" must satisfy strict scrutiny. *Fulton*, 593 U.S. at 537. The regulations here do not approach clearing this hurdle. HHS and EEOC admit that they reserve discretion to make "case-by-case" decisions on whether accommodating a particular employee or particular situation is an "undue hardship" that can be denied. 89 Fed. Reg. at 29,205. HHS and EEOC suggest they may perform this "individualized assessment" for religious objectors as well. 89 Fed. Reg. at 29,153; 89 Fed. Reg. 37,655-56; 92,301-02. But this is precisely the "case-by-case analysis" that "is antithetical to a generally applicable policy." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc); *see also U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 838 (N.D. Tex. 2022) (recognizing policy's allowance of "individualized assessment of the reasons" for non-compliance means

"favoritism is built into the mandate" and is not generally applicable). This case-by-case approach permits HHS and EEOC to decide both whether the economic burden on a covered entity is sufficiently compelling to exempt that entity, *and* whether an entity's religious belief is sufficiently important to warrant an exemption on a discretionary basis. Allowing "exemptions based on the circumstances underlying each application" triggers strict scrutiny. *Fulton*, 593 U.S. at 534.

Second, if a law "treat[s] any comparable secular activity more favorably than religious exercise," it again must pass strict scrutiny. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). But here, EEOC exempts any secular employer who can show an "undue hardship" and all employers with less than 15 employers from its mandates, exempting approximately 80 percent of private employers and leaving millions of employees uncovered. Supra at 41. And HHS exempts all insurers and third-party administrators that do not receive federal funding. Supra at 15–16. Because HHS and EEOC chose to treat such secular interests more favorably than religious objections to abortion for "no apparent reason other than administrative convenience," EEOC and HHS must satisfy strict scrutiny. *Bear Creek*, 571 F. Supp. 3d at 613 (holding EEOC interpretation of Title VII burdening religion subject to strict scrutiny because, in part, it exempted employers with fewer than 15 employees); *Youth 71Five Ministries v. Williams*, No. 24-4101, 2024 WL 3749842, at *3 (9th Cir. Aug. 8, 2024) (protecting religious hiring policies against anti-discrimination rules).

Having triggered strict scrutiny, HHS and EEOC fail to meet that burden for the reasons identified above under RFRA. And because HHS and EEOC have violated the Free Exercise Clause, Plaintiffs are entitled to their attorneys' fees and costs. 42 U.S.C. § 1988(b).

### 2.3. The AGT Mandate, the PWFA Rule, and the Harassment Guidance each violate the Free Speech Clause (counts 5-6).

The AGT Mandate, the PWFA Rule, and the Harassment Guidance violate the Free Speech Clause in two ways: (1) compelling Plaintiffs and their members to associate with employees whose conduct and speech undermines Plaintiffs' religious expression; and (2) restricting Plaintiffs' religious speech and compelling them to accommodate messages of which they disapprove.

***Expressive Association.*** First, HHS and EEOC's mandates violate the right of "expressive association." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). "[I]mplicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of" those activities. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (same) (internal quotation marks omitted). This freedom of association "plainly presupposes a freedom not to associate," and thus prevents an expressive association from being "forc[ed] . . . to accept members it does not desire." *Id.* at 648. A group's associational rights are burdened when it "engage[s] in some form of expression" and when the forced association would "significantly affect [its] ability to advocate" for its viewpoints. *Id.* at 648, 650. A court must "give deference to [the] association's assertions regarding the nature of its expression" and its "view of what would impair [that] expression." *Id.* at 653.

HHS's and EEOC's requirements burden Plaintiffs' expressive association rights. First, "[r]eligious groups" like those led by Plaintiffs are "the archetype of associations formed for expressive purposes," since their "very existence is dedicated to the collective expression and propagation of shared religious ideals." *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., joined by Kagan, J., concurring). Here, UIP Members like PublicSquare "specifically operate[] . . . as [a] Christian business," *Bear Creek Bible Church v. Equal Emp. Opportunity Comm'n*, 571 F. Supp. 3d 571, 615 (N.D. Tex. 2021) (subsequent history omitted), and JDFI operates a Christian ministry. *See* Seifert

Decl. ¶¶ 6–13; Compl. ¶¶ 119–40. Moreover, Plaintiffs and their members are engaged in overt expression regarding [their] religious views" regarding sex and sexuality. *See Bear Creek Bible Church*, 571 F. Supp. 3d at 615; Seifert Decl. ¶¶ 11–28; Compl. ¶¶ 119–68.

***Free Speech.*** Second, HHS's and EEOC's mandates violate Plaintiffs' free speech rights by censoring their religious speech within their organizations and by compelling them to permit messages that violate their beliefs. Both compelled speech and compelled silence are "presumptively unconstitutional." *NIFLA v. Becerra*, 585 U.S. 755, 766 (2018). This is particularly true for religious speech, since "the Free Speech Clause provides overlapping protection for expressive religious activities" that, along with the Free Exercise Clause, "doubly protects religious speech." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022).

The PWFA Rule states that it "broadly" prohibits anything that "might have dissuaded a reasonable worker" from seeking accommodations, including "interfer[ing]" in a request, "issuing a policy or requirement that purports to limit" seeking accommodations, or disciplining an employee for "assist[ing] a coworker in requesting" accommodation. 89 Fed. Reg. at 29,214-18. The PWFA Rule also bars "unwelcome, critical comments." *Id.* at 29,218. The Harassment Guidance explicitly prohibits "misgendering" an employee. Harassment Guidance n.42; *id.* § II(A)(5)(c). And the AGT Mandate requires covered entities to train their employees regarding the "non-discrimination" requirements in the Rule related to gender-affirming care, abortion, and artificial reproductive technology. 89 Fed. Reg. at 37,697, *to be codified at* 45 C.F.R. § 92.9. As HHS explains in the 2022 NPRM, healthcare providers are responsible for "'discrimination, stigma, and erasure'" if they speak or act in way that treats "pregnancy and childbirth . . . as something exclusively experienced by . . . women." 87 Fed. Reg. at 47,865. These provisions prohibit

Plaintiffs from informing applicants and employees of their current employment policies and beliefs regarding abortion, immoral infertility treatments, gender-affirming care, and biological sex. They also limit Plaintiffs' ability to encourage workers to make decisions consistent with Christian belief.

Because HHS and EEOC have violated the Free Speech Clause, Plaintiffs are entitled to their attorneys' fees and costs. 42 U.S.C. § 1988(b).

### 3. Plaintiffs will suffer irreparable harm absent an injunction.

Plaintiffs and their members are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). This is because "the loss of freedoms guaranteed by . . . RFRA . . . constitute per se irreparable harm." *Franciscan Alliance II*, 47 F.4th at 380 (citing *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 294 (5th Cir. 2012)). Additionally, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). Because Plaintiffs have alleged (and shown) the imminence of such injuries here, the irreparable harm prong is established for this case. *See Winter*, 55 U.S. at 22 (noting injunction appropriate where anticipated injury is imminent and not speculative); *see also supra* at 34-35 (cataloging agency enforcement actions and chilling effect on Plaintiffs' religious rights absent an injunction).

### 4. The balance of the equities and the public interest favor Plaintiffs.

The third and fourth prongs may be considered together as they overlap considerably and "merge when the Government is the opposing party." *Texas v. United States*, 809 F.3d 134, 187

(5th Cir. 2015). Because Plaintiffs succeed on the merits of their claims, Defendants must "present powerful evidence of harms to [their] interests" to prevent Plaintiffs from meeting the balancing requirement. *Opulent Life Church*, 697 F.3d at 297. This is not possible since the harm faced by Plaintiffs is severe while the harms to government are non-existent.

The EEOC admits that both the PWFA and Title VII exempt employers with fewer than fifteen employees. And HHS admits that Section 1557 does not cover all employers, insurers, and third-party administrators. "[W]here the regulation [is underinclusive and] fails to address significant influences that impact the purported interest, it usually flushes out the fact that the interest does not rise to the level of being 'compelling' . . . enough to justify abridging core constitutional rights." *281 Care Comm. v. Arneson*, 766 F.3d 774, 785 (8th Cir. 2014) (second alteration in original). The public interest "factor overlaps considerably with the previous one, and most of the same analysis applies." *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015). "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). It is not in the public interest to force Plaintiffs, contrary to their Christian faith, to accommodate their employees' abortions and immoral infertility treatments, to use false pronouns, to abstain from expressing Biblical teaching regarding sexual issues, and to give employees of one sex access to private spaces reserved to those of the other sex.

On the other side of the ledger, the government cannot identify any particularized—let alone compelling—equities that favor forcing Christian employers to accommodate direct abortion or treat gender transition in ways contrary to sincere religious beliefs. At most, the government points to an interest in supporting women in seeking an abortion or employees in not being subject to pronoun use with which they disagree. Neither stands up to scrutiny. When it comes to respecting

49

the freedom of religious employers to organize their affairs consistent with religious beliefs, courts have regularly declined to allow the government to point to claimed impact on employees. That same theory of third-party harm was repeatedly raised in the plethora of contraceptive mandate cases and rejected by courts up to the U.S. Supreme Court. *Hobby Lobby*, 573 U.S. at 727 (rejecting third-party harm argument). Even if the government has a generalized interest in the harms of employees that consideration must be understood in the context of this litigation: does the government have an interest in *forcing these religious employers* to provide accommodation to hostile employees. The public interest and equities from the general application of the government's chosen position cannot be applied to Christian employers without a far more particularized showing than the government has even attempted here.

## 5. Request for Relief

Plaintiffs respectfully request that the Court enter the declaratory and injunctive relief requested at pages 55 to 62 of their verified complaint, paragraphs A–N, and award reasonable attorneys' fees and costs as requested by Plaintiffs at page 61, paragraph P of their verified complaint as required by 42 U.S.C. § 1988(b). The relief requested declares that Section 1557, Title VII, and the PWFA do not require Plaintiffs and their members to cover or provide gender-affirming care, or accommodate employee abortions, immoral artificial reproductive technologies, false pronouns, or requests to improperly access single sex spaces. The relief requested will enjoin Defendants from pursuing an enforcement action under the challenged interpretations.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court enter judgment in favor plaintiffs, enjoin the challenged rules, and award reasonable attorneys' fees and costs.

November 11, 2024

Respectfully submitted.

*/s/ John C. Sullivan*
Texas Bar No. 24083920
John.sullivan@the-sl-lawfirm.com
Jace R. Yarbrough
Texas Bar No. 24110560
Jace.yarbrough@the-sl-lawfirm.com
S|L LAW PLLC
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
T: (469) 523-1351
F: (469) 613-0891

*/s/ Andrew Nussbaum*
L. Martin Nussbaum *
*martin@first-fourteenth.com*
Andrew Nussbaum
*andrew@first-fourteenth.com*
FIRST & FOURTEENTH PLLC
2 N. Cascade Ave., Suite 1430
Colorado Springs, CO 80903
T: (719) 428-2386

*\* application for admission pending*

*Attorneys for Plaintiffs*